## WHEAT et al. v. TEXAS CO.
### No. 11073.

Court of Civil Appeals of Texas,
San Antonio.
Jan. 21, 1942,

Rehearing Denied March 4, 1942.

William Aubrey, Carter & Lewis, and Randolph L. Carter, all of San Antonio, for appellant.

Wm. E. Loose and W. O. Crain, both of Houston, and Eskridge & Groce and Walter Groce, all of San Antonio, for appellee.

NORVELL, Justice.

This is an appeal from a judgment based upon an instructed verdict that appellant, Mrs. William M. Wheat, take nothing as against appellee, The Texas Company. The trial court in effect held as a matter of law that there was no evidence which would support a finding that Sam Gossen, the operator of a gasoline filling station situated at the intersection of McCullough Avenue and Dewey Street, San Antonio, Texas, was the servant of The Texas Company in the conduct of said business. The question of the correctness of this holding is the controlling question in the case.

Appellant does contend that the jury under the evidence could have made finding under which appellee would have been liable to appellant upon the theory that the premises leased by The Texas Company to Gossen were in such condition as to constitute a nuisance. There is no evidence supporting this theory or the sug-

gestion advanced by appellant that The Texas Company and Gossen were engaged in a joint enterprise.

On March 10, 1938, Mrs. Wheat sustained serious bodily injuries as a result of a fall upon the sidewalk adjacent to the service station. Lubricating oil previously drained from a motor car had been washed across the sidewalk by water from a hose, rendering the sidewalk slippery and slick. From the positions here taken by the parties it may be considered for the purposes of this appeal that Gossen was negligent and that such negligence was a proximate cause of Mrs. Wheat's injuries.

The question of whether or not Gossen's negligence, viewing the evidence in its most favorable light from appellant's standpoint, can be attributed to The Texas Company under the doctrine of respondeat superior is therefore the controlling and, in fact, the only substantial issue in the case.

The evidence upon this point consists of three written instruments and the testimony of Sam Gossen, who was the operator of the service station involved for a period of approximately three years.

The documentary evidence consisted of a "Lease Contract," "Letter Modifying Rental Clause," and a "Sales Contract." The subject matter of the lease was an equipped filling station in the location above set out. The term was for one year and thereafter from year to year, subject to termination by either party at the end of the first year or any subsequent year on ten days' prior written notice. The rental provided for was $280 per month payable in advance.

The lease further provided:

"*Use*. Lessee shall use the said premises and the buildings, improvements and facilities thereon primarily for the operation of a gasoline service station and the sale of automobile accessories; but in no event shall said premises be used for any unlawful or offensive purpose.

"*Maintenance*. Lessee shall, during the term of this agreement, maintain the said premises, buildings and equipment, in good repair and in a clean, safe and healthful condition. * * *

"*Lessee's Default*. In event of abandonment of the said premises by Lessee, default by Lessee in the payment of rent or breach of any of the terms, covenants and conditions of this lease, * * * or in event of death of Lessee, Lessor may, without notice, immediately terminate this agreement and all Lessee's rights hereunder, and reenter and, in any manner, resume possession of said premises, improvements and facilities, the Lessee hereby waiving all statutory rights inconsistent herewith."

The letter modifying the rental clause of the lease was addressed to Sam Gossen and read as follows:

"Texas Company

Houston, Texas,
November 26, 1937
Mr. Sam Gossen                    Robertson L/B
San Antonio, Texas.

Dear Sir:

Referring to that certain lease dated October 21, 1937, between The Texas Company, as lessor, and you, as lessee, covering premises located at McCullough & Dewey, San Antonio
State of Texas:

It is hereby mutually understood and agreed that paragraph (3) 'Rental' shall be and the same is hereby temporarily amended to read as follows:

'(3)—Rental. From November 1, 1937, until cancelled, Lessee shall pay the Lessor as rent for the use of the demised premises the sum of One hundred dollars, ($100.00) per month, plus one cent (s) per gallon for each gallon of gasoline delivered to the demised premises for resale in excess of 10,000 gallons per month, such rental to be payable on the 10th day of each month next following the month for which the rental is due.'

Except as hereunder specifically modified, said lease shall continue in full force and effect.

Yours very truly,
The Texas Company
By C. N. Brooks
Accepted:
Sam Gossen"

In the Sales Contract The Texas Company agreed to sell and Gossen agreed to buy during each year the contract was in force not more than "130,000 gallons of gasoline, 2,500 gallons of Motor Lubricants, sold by the gallon, and 2,500 pounds of Motor Lubricants, sold by the pound, and not less, per year, than 104,000 gallons of gasoline, 2,000 gallons of Motor

Lubricants, sold by the gallon, and 2,000 pounds of Motor Lubricants sold by the pound, * * *."

As to prices of gasoline, the agreement provided as follows: "Prices. For Texaco Ethyl Gasoline, Texaco Fire-Chief Gasoline, and Indian Gasoline, at Seller's election at time of delivery, either the Seller's posted service station price therefor, less Seller's posted discount to Dealers, or the Seller's posted Dealer's price therefor as posted and displayed at Seller's bulk plant from which deliveries hereunder are made at time of delivery."

The price of motor lubricants was determined by the net prices shown on Seller's Schedule. One of these Schedules introduced in evidence shows that a "Retail Price" and "Dealer Prices" were both given.

This agreement also contained the following provisions:

"Seller, at its option, may terminate this agreement forthwith by written notice upon Purchaser's failure to perform any of the obligations imposed upon Purchaser hereby. * * *

"If Seller elects to base prices on Seller's posted service station price less Seller's posted discounts to Dealers, the words 'Seller's Posted Service Station Price' mean Seller's gross service station price for the products sold and delivered hereunder as posted and displayed at Seller's bulk plant from which deliveries hereunder are made at time of delivery, without deduction of any allowances and/or discounts in effect at time and place of delivery, and the words 'Seller's Posted Discounts to Dealers' mean Seller's prevailing, regular discount to Dealers of Purchaser's class for the products sold and delivered hereunder as posted and displayed at Seller's bulk plant from which deliveries hereunder are made at time of delivery in respect to the point of delivery. The election of Seller to base prices either on Seller's Posted Dealer's Price or on Seller's Posted Service Station Price less Seller's Posted Discounts to Dealers on any deliveries shall not affect Seller's right to change to either of said prices on any future deliveries at any time or from time to time. * * *

"Purchaser shall not sell products purchased from others under the trade mark or trade name of Seller, unless Seller shall, after analysis thereof, give special consent in writing; but Purchaser, however, shall have the right to use the trade marks and trade names of Seller to identify and advertise Seller's products handled by Purchaser provided and on condition that Purchaser shall follow directions as to manner of such use given to Purchaser by Seller from time to time."

Gossen testified that he had no verbal agreement or secret arrangement with any one concerning the operation of the service station, but that the written instruments constituted all of the "contracts" he had.

▆ If we look to the documentary evidence alone it can safely be said that the relationship between the Texas Company and Gossen was not that of principal and agent or master and servant. However, as we understand the authorities hereinafter discussed, Mrs. Wheat, who was not a party to the written instruments, is not necessarily bound by the apparent relationship created thereby. Nor is the statement of Gossen, that he had no other agreements other than those in writing, necessarily conclusive, provided that if from his testimony as to actual operations under the contract, an inference can legitimately be drawn that some further or other agreement or understanding actually existed between the parties.

Gossen testified that "the fact of the business was that (a monthly rental of $280) was a higher rental than a fellow could afford to pay," and that he had never sold in excess of 10,000 gallons of gasoline in any one month.

It also appears from Gossen's testimony that the difference between the "Posted Dealer's Price" and "Seller's Posted Service Station Price," mentioned in the sales contract, was the "posted discount to dealers," and that if he sold gasoline at less than the "posted service station price," he cut into his commission or profit, while if he attempted to sell above the posted service station price, "competition would take care of him." Although he testified that no representative of The Texas Company told him what price to charge for gasoline, the record shows that Gossen did sell gasoline at the "posted service station price," except in perhaps a few instances. This was also true of sales of oils as regards the listed retail prices in the "Seller's Schedule" of prices, although there is some indication that Gossen made more departures from the listed prices in the case of lubricating oil than he did in the case of gasoline.

Gossen testified as to the appearance of the service station involved and photographs thereof were introduced in evidence. The building was painted white and trimmed in green, in the manner generally employed in painting or decorating stations where The Texas Company products are sold. Gasoline pumps, as well as other pieces of equipment, carried advertising and the registered trade-mark of the company. The station was also equipped with signs advertising "Texaco" products, including a large "banjo" type sign of circular shape approximately six feet in diameter supported by a post. This sign was sixteen to eighteen feet in height. Also, upon the premises there was a sign relating to a "Texaco Registered Rest Room" which is a feature of Texaco stations that has been nationally advertised. Gossen, however, testified that he had his own name on the station; that the telephone was in his name, and he paid all charges for telephone and utility services.

It appears that The Texas Company painted the station at least two times during the three years of Gossen's operation thereof. The company also made a number of repairs of equipment, including the removal and re-sealing of one of the gasoline storage tanks that had developed a leak.

Gossen honored credit cards issued by The Texas Company under an arrangement whereby he exchanged receipts signed by holders of said cards for petroleum products; said receipts being taken by the Company at their face value upon all purchases made by Gossen.

Gossen testified that from time to time representatives of The Texas Company would inspect the station and give "suggestions" or "instructions" concerning its operation. For example, according to Gossen, Mr. Peebles, a representative of The Texas Company, "would come around and walk around and go to the rest room, and if it wasn't clean he would say, 'Sam, maybe you ought to clean it up. It would look nicer.' He would go out on the driveway, and if it was dirty he would tell me that the driveway was dirty and that I ought to clean it up."

Gossen also attended meetings held by The Texas Company for service station operators. At these meetings instruction was given as to proper operating methods. Instructions or suggestions were also made

as to keeping oil and similar substances off the pavement and keeping the station clean in that respect.

It appears that Gossen for the most part complied with the instructions or suggestions made by The Texas Company representatives and instructors.

The rules governing a review of the evidence and inferences to be drawn therefrom by an appellate court in cases involving a peremptory instruction are stated in Lawson v. Hutcherson, Tex.Civ. App., 138 S.W.2d 131; Coca-Cola Bottling Co. v. Dickson, Tex.Civ.App., 115 S.W. 2d 1223, and Kleising v. Miller, Tex.Civ. App., 83 S.W.2d 732. The rule stated in Commercial Standard Ins. Co. v. Davis, 134 Tex. 487, 137 S.W.2d 1, that when various inferences can be drawn from uncontroverted facts a jury question is presented, also has some application to the facts of this case, as does the rule that conflicts in the testimony given by one witness generally present an issue for a jury determination. New St. Anthony Hotel Co. v. Pryor, Tex.Civ.App., 132 S. W.2d 620, writ refused.

The recent case of Texas Company v. Freer, 151 S.W.2d 907, decided by the Waco Court of Civil Appeals since the trial court's judgment in this case was entered, appears to be nearer in point upon the facts than any other case cited in the briefs. Although appellee presents able arguments in support of fact distinctions between this case and Texas Company v. Freer, we are of the opinion that the application of the rules of law enunciated in the Freer case to the facts here presented would lead to a reversal of the case.

Appellee, however, points out that by dismissing the petition for writ of error in the Freer case with the notation, "W. O.J. correct judgment," the Supreme Court did not necessarily approve all of the holdings of the Court of Civil Appeals expressed in the opinion.

We can not with absolute certainty say that the Supreme Court did approve the Waco Court's holdings upon the question of the existence of a master-servant relationship between the Texas Company and the service station operator, especially in view of the fact that the Court of Civil Appeals also held that the premises involved in the Freer case, which had been leased by The Texas Company to the oper-

ator, were in a defective state, i. e., constituted a nuisance, and under this holding alone the judgment of the Waco Court could be considered correct. As above pointed out, we hold that appellant's "nuisance" theory put forth in this case is not well taken.

After careful consideration of the authorities bearing upon the question, we are of the opinion that the decision in the Freer case upon the issue of agency is in accord with the rules stated in prior Texas cases, and we briefly discuss a few of them with reference to the facts disclosed by the record before us.

■ Obviously, the evidence in this case would support findings that Gossen, in operating the station involved, occupied the position of an independent contractor, under the definition set forth in the Freer case, which also contains a definition of the word "employee" which has application here. It also seems well settled that the legal relationship of master and servant must rest upon contract, as, in Lone Star Gas Company v. Kelly, Tex.Com. App., 46 S.W.2d 656, 657, Judge Critz said, "the relationship of master and servant depends, not on the exercise of control over the work, but the *right* to exercise such control."

This contract *right,* however, need not be founded upon a written contract, and in cases involving the rights of third parties, written instruments purporting to define the rights of the contracting parties are not conclusive of the actual legal relationship existing between said parties. Gulf Refining Co. v. Rogers, Tex.Civ. App., 57 .S.W.2d 183. In this particular case, we do not regard the written contracts involved as necessarily negativing the existence of a master and servant relationship, although admittedly insufficient in themselves to create such relationship. However, if supplemented by further agreements or understanding, it might be said that the master-servant relationship did exist in fact.

Gossen was experienced in the operation of Texaco Service Stations, having been employed as an attendant in a Texaco Station situated on the Fredericksburg road in San Antonio prior to the time he became the operator of the station here involved. In fact, he testified that he never read over closely or carefully the written contracts he had signed. This, despite the fact that he operated the McCullough-Dewey Station for about three years with apparent satisfaction.

A jury may have properly inferred that this situation was somewhat similar to that disclosed in the report of Blankenship v. Royal Indemnity Co., 128 Tex. 26, 95 S.W.2d 366, 367, wherein the late Judge German said: "One of the difficulties confronted in the case arises out of the fact that as plaintiff was an experienced carpenter and had done work for the Crain Ready-Cut House Company and its predecessor for a number of years, it was taken for granted that he knew in a general way what was to be done, and the contract in some particulars was never actually expressed in words, but was left to the general understanding of the parties."

This being true the following quotation from the annotation in 20 A.L.R. 725, quoted by Judge German, has application: "Evidence which shows that the employer did, as a matter of fact, interfere with, or give directions concerning, certain particulars of the work, has a material bearing both upon the rights and liabilities of the parties to the contract and upon the enforceability of claims in respect of injuries caused by acts done in the course of the work. Such evidence * * * may be regarded as tending to establish the general conclusion that the employer's acts were done in pursuance of a *right reserved* by him at the time when the contract was made, or *acquired* by him with the consent of the contractor after the commencement of the stipulated work, and that he consequently occupied the position of a master with respect to the person employed." (Italics ours.)

■ Applying the foregoing rules to the case before us, we are of the opinion that it cannot be said that there was no evidence of a master-servant relationship. It is not necessary for the .purposes of this opinion to consider each particular item of evidence and point out all possible legitimate inferences that may be drawn therefrom, but certainly the jury was entitled to consider the possible and contractual permissible effect of the rent reduction letter in conjunction with the terms of the written lease. It is apparent that The Texas Company, in effect, retained the right to terminate Gossen's tenancy at will by the simple expedient of withdrawing the letter, and thus place in effect a prohibitive rental rate. This circumstance in turn has a material bearing upon the na-

ture of the "suggestions" or "instructions" which Gossen from time to time received from representatives of The Texas Company. From the facts and circumstances of this case, as disclosed by the record, we are of the opinion that a jury may have properly concluded that there existed between The Texas Company and Gossen an agreement or understanding, express or implied, oral or written, or partly oral and partly written, whereby The Texas Company retained the right to prescribe the material details of the means and methods employed in the operation of the service station involved. Texas Company v. Freer, Tex.Civ.App., 151 S.W.2d 907; Gulf Refining Co. v. Rogers, Tex.Civ.App., 57 S.W.2d 183.

It follows that the trial court erred in peremptorily instructing the jury to find for appellee. The judgment based thereon is reversed and the cause remanded.

### On Motion for Rehearing.

Upon rehearing, appellee asserts that there is no evidence that The Texas Company used the "posted service station price" less "posted discount to dealers" in determining the wholesale price of gasoline which it sold to Gossen, but, on the contrary, the "posted dealer's price" was employed for that purpose.

If the "posted dealer's price" be taken, then it appears from Gossen's testimony that the retail price at which Gossen sold gasoline to the public was said "posted dealer's price" plus a so-called commission. In other words, the differential between the wholesale price set by The Texas Company and the retail price generally charged by Gossen was either a discount, in case the "posted service station price" was employed, or "a commission" (to use the term employed by Gossen) in case the "posted dealer's price" was used.

We quote from parts of Gossen's testimony, first with reference to the "posted service station price":

"Q. You understood, didn't you, that the Texas Company would sell you these products at their service station price less a certain discount they would give you, the discount fixed in this contract? You understood that? A. Yes, sir.

"Q. And that discount would be how much profit you would get on it? A. That is right. * * *

"Q. Now, then, Mr. Gossen, under those circumstances if you sold gasoline for less than the current posted price you would lose money by that? A. Yes, sir.

"Q. It would come out of your pocket? A. Yes, sir.

"Q. Was that a pretty good reason, insofar as you were concerned, for continuing to sell gasoline at the posted price? A. Yes, sir.

"Q. In other words, you couldn't make much money by selling under the posted price? A. That is right."

With reference to the "posted dealer's price," Gossen testified:

"Q. Who would you consult with to keep the price together? Didn't your information and instructions as to what the retail price to sell at would be, come from the Texas Company? A. I would ask them.

"Q. How much commission did they allow you? A. Four or four and a half cents.

"Q. The Texas Company had a regular posted dealer's price, didn't they? That would vary at different times, but they had a posted dealer's price? A. Yes, sir.

"Q. How much did you add,—how did you know how much to add onto that for your commission? A. Whatever the cost of gasoline was and whatever my commission was supposed to be.

"Q. Who would tell you what your commission was supposed to be? The Texas Company would, wouldn't it? A. Yes, sir.

"Q. Representatives of the Texas Company would tell you that, wouldn't they? A. Yes, sir."

The evidence shows that Gossen generally sold gasoline at the "posted service station price," or at the "posted dealer's price" plus whatever Gossen's so-called commission was supposed to be, according to information received from The Texas Company.

Appellee's motion for rehearing is overruled.