**NEWSPAPERS, INC., Petitioner,**

**v.**

**Gerald Witt LOVE et al., Respondents.**

**No. A–9629.**

Supreme Court of Texas.

March 4, 1964.

Dissenting Opinion March 11, 1964.

Rehearing Denied June 24, 1964.

Gay & Meyers, Austin, for petitioner.

Byrd, Davis & Eisenberg, Austin, for respondents.

NORVELL, Justice.

The crucial issue in this case is whether the relationship of C. E. Cargile to Newspapers, Inc. was that of a servant or an independent contractor. The trial court rendered judgment upon jury findings in favor of Gerald Witt Love et al., the plaintiffs in the district court, and against Newspapers, Inc. upon the theory that Cargile was the servant of Newspapers, Inc. and his negligence was one of the proximate causes of plaintiffs' injuries sustained in a wreck in which automobiles driven by Otis Franklin and by Gerald Witt Love and a pickup truck driven by C. E. Cargile were involved. This judgment was affirmed by the Court of Civil Appeals. 367 S.W.2d 185.

In the trial petition it was alleged that prior to and at the time of the collision Cargile "was an authorized agent, servant or

employee of Newspapers, Incorporated, and he was then acting for and on behalf of Newspapers, Incorporated, and within the scope of his employment or within the authority delegated to him by Newspapers, Incorporated."

The evidence shows that Cargile was employed by Newspapers, Inc. as publisher under a written contract which constituted Cargile an independent contractor in distributing the newspapers published by petitioner.[1] The allegations of the petition above set out were sufficient to admit evidence tending to show this written contract was intended as a subterfuge by the contracting parties or that it had been abandoned by them.[2] Such evidence was adduced

as hereinafter pointed out, so that the complaint that there was *no* evidence that the written contract between the parties was inoperative and not controlling must be overruled. Humble Oil & Refining Co. v. Martin (1949), 148 Tex. 175, 222 S.W.2d 995.

We are, however, of the opinion that in view of the evidence adduced upon the trial the independent contractor or servant issue was improperly submitted to the jury and accordingly the judgment against Newspapers, Inc. must be reversed and the cause as to the petitioner remanded for another trial.[3]

Special Issue No. 1 which embodied respondents' master-servant theory was an-

1. In a supplemental brief filed in this Court it is argued that there was no showing that a written contract between Newspapers, Inc. and Cargile was in existence at the time of the collision (April 11, 1959) which gave rise to this action, and that if such written contract did exist, its terms violated the anti-trust laws of this State. Article 7426, Vernon's Ann. Tex.Stats. Phil Granath, the City Circulation Manager for Newspapers, Inc., testified that Cargile had distributed papers for the publishing company for a number of years and had worked under a contract essentially the same as that introduced in evidence which bore the date of February 1, 1960. Cargile didn't know the whereabouts of his contract covering the year 1959 and didn't remember for sure whether he had one or not. The Court of Civil Appeals in its opinion states categorically that, "He (Cargile) had a written contract with Newspapers, Inc." at the time of the collision and set forth the terms thereof. In our opinion this was a correct statement of the record. It does not appear that the contention of "no written contract" was seriously urged in the courts below. The Court of Civil Appeals based its ruling that the testimony of the witnesses Wheeless and Behrman was admissible upon the premise that such witnesses who admittedly served as district circulation managers under a written contract were "similarly situated" to Cargile. In this Court respondents reurge this argument which was accepted by the Court of Civil Appeals. As to the testimony of Wheeless and Behrman, see infra this opinion.

As to the anti-trust laws it should be noted that this is not a suit upon a contract said to be invalid because of a statutory inhibition. If the written contract evidences the mutual understanding of the parties as to who should control the means and details of the work in question, the fact that a part of the contract is invalid could not bring about a different legal relationship from that agreed upon by the parties. See, Carter Publications, Inc. v. Davis, Tex.Civ.App., 68 S.W.2d 640, wr. ref.

2. There was no direct allegation in respondents' petition that the contract between Newspapers, Inc. was a sham or subterfuge. Knowledge of the existence of the contract was a matter concerning which the respondents may have had no personal knowledge. The allegation was that Cargile was the servant of Newspapers, Inc. and acting within the scope of his authority. Under the system of pleading permitted by the Texas Rules of Civil Procedure, proof of the written contract was admissible to counter the allegation of the master-servant relationship. When this was done the respondents were entitled to offer competent and relevant evidence tending to show that the written contract was a mere subterfuge. See Rules 47, 78, 79, 83, 84, 85, 90, 91, 92 and 93.

3. Otis Franklin and C. E. Cargile were defendants in the District Court but neither perfected an appeal to the Court of Civil Appeals.

swered by the jury in the affirmative. This issue read as follows:

"At the time and on the occasion in question, do you find from a preponderance of the evidence that the relationship between C. E. Cargile and Newspapers, Inc. was such that Newspapers, Inc. *retained or exercised* the power to control, not merely the end sought to be accomplished, but also the means and details of its accomplishment, not merely what should be done, but how and when it shall be done?" (Italics added)

Special Issue No. 2 was an inferential rebuttal issue embodying petitioner's theory that Cargile was an independent contractor. The jury answered that, "He (Cargile) was not an independent contractor." This issue and the accompanying definition read as follows:

"At the time and on the occasion in question, do you find from a preponderance of the evidence that C. E. Cargile was not an independent contractor within the meaning of the following definition? * * *

"You are instructed that the term 'independent contractor,' as used in the foregoing special issue, means a person who undertakes to do work for another person, using his own means and methods, without submitting himself to the contract of such other person in the details of such work, except as to the result of the work."

Cargile's relationship to Newspapers, Inc. was either that of a servant or that of an independent contractor. This was a controlling point in the case and the jury must have understood that it was. Any error relating to the submission of the master-servant theory would consequently affect the independent contractor issue. It can hardly be maintained that a judgment could be supported by an unfavorable answer to an inferential rebuttal issue when the primary issue upon which a party must depend for a recovery is improperly and prejudicially stated.

Petitioners objected to the submission of Special Issue No. 1 because of the use of the words "retained or exercised" and asserted that, "the true test is whether or not the alleged employer has the power (right) to control and the usurpation of such power does not make the relationship one of employer and employee."

There are cases which speak of the right of control or exercise of control of the details of the work as being the test of the existence of a master-servant relationship. As indicated by the Court of Civil Appeals, the case of King v. Galloway, Tex.Com. App., (1926) 284 S.W. 942, relied on by petitioner, quotes a definition from Street on Personal Injuries, §§ 11 and 12 which embodies the words "retains or exercises the power of control," but the actual holding of the case is embodied in the following quotation:

"In the first place, it must be borne in mind that on the question of control, the test is not the exercise thereof, but the right to exercise such control. In this connection, we quote from Labatt, p. 240, 19 A.L.R., as follows:

" 'In every case which turns upon the nature of the relationship between the employer and the person employed, the essential question to be determined is not whether the former actually exercised control over the details of the work, but whether he had a right to exercise that control.' "

The A.L.R. note referred to by Judge Powell in the Commission's opinion was prepared by C. B. Labatt, the author of the "Commentaries on the Law of Master and Servant", and the cases cited in the monograph generally support the proposition that it is the right of control rather than the exercise thereof that determines the master-servant relationship. See, Annotation— "General discussion of the nature of the relationship of employer and independent contractor," 19 A.L.R. 226, l. c. 240, § 7.

586

In Standard Insurance Company v. McKee (1947), 146 Tex. 183, 205 S.W.2d 362, Mr. Justice Smedley, writing for this Court, said:

"The record contains evidence of elements bearing upon the relation between respondent and the oil company from which it could reasonably be inferred that respondent continued to be an independent contractor during the time when the well was being finished. We believe, however, that the solution of the question presented in this case is correctly reached by the application of the test of *right of control,* which, according to our decisions and most of the modern cases, is used as the supreme test. Ochoa v. Winerich Motor Sales Co., 127 Tex. 542, 94 S.W.2d 416; Blankenship v. Royal Indemnity Co., 128 Tex. 26, 95 S.W.2d 366; Southern Underwriters v. Samanie, 137 Tex. 531, 155 S.W.2d 359; Industrial Indemnity Exchange v. Southard, 138 Tex. 531, 160 S.W.2d 905; Dennis v. Texas Employers' Ins. Ass'n, Tex.Civ.App., 116 S.W.2d 492; Khoury v. Edison Electric Illuminating Co., 265 Mass. 236, 164 N.E. 77, 60 A.L.R. 1159; Northwestern Mutual Life Ins. Co. v. Tone, 125 Conn. 183, 4 A.2d 640, 121 A.L.R. 993; 27 Am.Jur., p. 486, Sec. 6." (Italics added)

The "right of control" and "the exercise of control" (or the exercise of the power of control) are two separate concepts. Following the pattern suggested by Special Issue No. 1, we could by separate questions inquire (a) if the relationship between Cargile and Newspapers, Inc. was such that Newspapers, Inc. retained the power to control, etc., and (b) if the relationship between Cargile and Newspapers, Inc. was such that Newspapers, Inc. exercised the power to control, etc. We may accept the theory that the evidence received from the witnesses, Behrman and Wheeless was admissible in connection with the statement attributed to Phil Granath, (hereinafter mentioned), to show that the terms of the written contract were not intended to control the relationship beween Newspapers, Inc. and its distributors. This evidence would, however, have to be related to the theory of "right of control," i. e., whether the written contract was a subterfuge or had been superseded by a subsequent agreement which controlled the relationship of the parties. When, however, we turn to the concept of "exercise of control," it should be pointed out that neither Behrman nor Wheeless testified to any exercise of control by Newspapers, Inc. over Cargile. Cargile's deposition was taken before petitioner was made a party to this suit; consequenty he was not subject to examination by Newspapers, Inc. However, the statements of Cargile in this deposition relate to his opinions or conclusions as to the relationship between him and Newspapers, Inc. and not to any definite or specific acts of control exercised by Newspapers, Inc. over Cargile's actions other than such as were consistent with an independent contractor relationship such as directing when Cargile should pick up his papers and when he should deliver them.

We, therefore have an issue which the jury could have answered in the affirmative if they believed petitioner exercised control over Cargile as to the details of the work, yet there is no competent evidence that such control was actually exercised by Newspapers, Inc. As above pointed out, the "right of control" is an entirely different concept.

All the evidence relating to incidents of actual exercise of control of the details of the work by Newspapers, Inc. to relate to control exercised over F. V. Wheeless and Mayes Behrman, former distributors for Newspapers, Inc. They are referred to as district circulation managers. This designation is also used with reference to Cargile, although Newspapers, Inc. seems to prefer the term of "route carrier." It was the position of Newspapers, Inc. and the testimony of its City Circulation Manager, Phil Granath, that all district circulation managers, including Cargile, operated under the

form of contract heretofore mentioned which by its provisions constituted them independent contractors. Granath also testified that the operations of Newspapers, Inc. in connection with their district distributors, were wholly consistent with the provisions of the contract they had signed with Newspapers, Inc.

Behrman and Wheeless gave an entirely different version of the actual relations between the publisher and its district managers. As pointed out by the Court of Civil Appeals, Behrman testified that Granath, the city circulation manager, told him that he "should know by now that (the written) contract is not worth the paper it is written on. It is meant to protect the company." Both Behrman and Wheeless testified to numerous incidents of control which are set forth in the opinion of the Court of Civil Appeals and from which it could be contended that the written contract was a subterfuge or had been superseded or modified by a subsequent contract under which the publisher retained the right of control as to details. It was strongly argued to the jury that the nature of efficient newspaper distribution was such that it could be carried out only by exercising a detailed control over operations and methods.

While, as above pointed out, this evidence may be a basis for contending that the securing of contracts and going through the procedure of appointing independent contractors was a sham and a subterfuge, and could have been received by the Court under an instruction as to its purpose, it appears in an entirely different aspect when relied upon to support the thesis that the publisher *exercised control* over the details of the work done by Cargile. Unless we can say that the entire method of distribution employed by Newspapers, Inc. was a subterfuge, it can hardly be maintained that because the publisher assumed control over the details of the work insofar as Behrman and Wheeless were concerned, it also assumed control over the details of Cargile's operations. An employer may leave an efficient independent contractor alone as detailed supervision may not be necessary to secure the objectives sought to be obtained by the contract. Further, the evidence showed that no one except his wife aided Cargile in carrying out his distribution duties. His route was essentially a rural one and he did practically all the work himself. On the other hand, Wheeless had 24 boys and 5 men who delivered papers for him. Behrman had 16 to 22 carrier boys working for him and never delivered any papers personally unless there was an emergency caused by an illness of a carrier boy or some similar situation. It appears that there was a substantial difference between the operations conducted by Cargile on one hand and Behrman and Wheeless on the other. The assertion of control over the more complicated operations of a distributor using numerous carrier boys is hardly evidence of an exercise of control over a rural route carrier such as Cargile.

Respondents argue that district managers were required to employ young boys rather than men as carriers, that such carriers were required to sign contracts, that the district circulation managers were required to see that the carrier boys were around early in the morning—to wake them up if necessary, to make certain, in some instances, that newspapers were placed on the porches of the residences of customers, and the like. These matters all relate to the use of carrier boys,—and Cargile employed none.

In Texas & Pacific Ry. Co. v. Reed (1895), 88 Tex. 439, 31 S.W. 1058, one question involved was whether or not one Ed' Moore, a night yardmaster or foreman, had the power to employ Reed, the plaintiff. Evidence of the custom of other railroads and the practice at stations other than Toyah, where Moore was the yardmaster, was admitted as throwing light on Moore's authority. It was held that a dissimilarity of conditions rendered such evidence inadmissible. This Court said:

"We think, however, that testimony of witnesses who know the fact that the

yard foreman at Toyah and at stations on defendant's line of a like character were accustomed to employ and discharge hands was, in view of the conflicting evidence in the case, admissible as having a tendency to show that Moore, at the time of the accident, had the authority in question. But the conditions at large stations, where much freight and many cars were to be handled, are so different from those at small places that we are of opinion that the practice of the latter raises no presumption that the same practice existed at the former. In no case, however, should a witness be permitted to testify as to the fact of the existence of the foreman's authority at any station, unless he knows of his own knowledge of the authority being communicated, or has knowledge of the existence of the fact by being present when such foreman actually employed or discharged hands."

See also, Wigmore on Evidence, (3rd Ed.) § 379.

■ In the present case, testimony (admitted over objection) showing exercise of control over Wheeless and Behrman was incompetent to show actual control over Cargile as to the details of the work.

As above mentioned, there are a number of cases which, in defining the legal status of a servant, use the phrase "exercise of control," along with the words "right of control." In most applications of a definition thus worded, no harm could result, but in some instances, such as the case now before us, a grave misunderstanding of the nature of the master-servant relationship in the minds of a jury could take place. Quite obviously, in cases such as this one where a written contract is involved, the sporadic action of some zealous or over-active supervisor is directing the details of the work covered by a written or clearly stated oral contract, would not destroy the contract. A building contractor agreeing to construct a residence for a man and wife in accordance with written plans and specifications. does not cease to be an independent contractor insofar as the building of the house is concerned, simply because the wife may, despite the written contract, give minute instructions as to how she wants her fireplace constructed.

We are concerned with a contractual species of agency and the actual agreement between the parties must control the question of vicarious liability. Sir John Salmond, in his "Law of Torts" (6th ed.), p. 12, said, "Reason demands that a loss shall lie where it falls unless some good purpose is to be served by changing its incidence; * * *." It is generally considered that when one commits a wrong which causes another harm, this is a good reason for shifting the loss from the person injured to the one committing the wrongful act. When, however, one's servant commits the wrongful act and liability is asserted against the master, we have two situations in which liability may be imposed. The first situation is the one in which the harmful act is directed by the principal. A different principle of law is then applicable from that presented here. Newspapers, Inc. was exercising no control over the way Cargile was driving his automobile at the time of the accident. The second situation is premised upon the contractual relationship existing between those said to be master and servant.

The difference between a specific exercise of control and liability arising out of a contractual master-servant relationship giving rise to a right of control was made rather clear by Holmes some years ago when he pointed out that, "[I]t is plain good sense to hold people answerable for wrongs which they have intentionally brought to pass, and to recognize that it is just as possible to bring wrongs to pass through free human agents as through slaves, animals, or natural forces. This is the true scope and meaning of 'Qui facit per alium facit per se,' and the English law has recognized that maxim as far back as it is worth while to follow it." "Agency," Oliver Wendell Holmes,

Jr., 4 Harvard Law Review 345, 1. c. 347. On the other hand in discussing the doctrine that charges the master with liability for the servant's wrong because of the existence of the master-servant relationship, Holmes said, "I assume that common-sense is opposed to making one man pay for another man's wrong, unless he actually has brought the wrong to pass according to the ordinary canons of legal responsibility,— unless, that is to say, he has induced the immediate wrong-doer to do acts of which the wrong, or, at least, wrong, was the natural consequence under the circumstances known to the defendant. * * * I therefore assume that common sense is opposed to the fundamental theory of agency. * * *" 5 Harvard Law Review 1, 1. c. 14. Holmes does suggest some policy basis for the rule holding the master liable for his servant's torts even in the absence of an immediate and specific exercise of control over the servant's actions, and a number of rationalizations have been advanced to support such rule including, among others, the thesis that each business enterprise which benefits from the services of others should bear the losses occasioned by its operations. See, Philip Mechem "Outlines of the Law of Agency," §§ 349–363; John H. Wigmore, "Responsibility for Tortious Acts: Its History." 7 Harvard Law Review 315, 383 and 441; William O. Douglas, "Vicarious Liability and Administration of Risk", 38 Yale Law Journal 584 and 720; Clarence Morris, "The Torts of an Independent Contractor", 29 Illinois Law Review 339.

The doctrine which holds the master liable for the torts of his servant committed in the course of his employment is essentially a policy doctrine and except for acts personally directed by the principal, the liability of the master is founded upon the contractual arrangement with the servant, either expressed or implied which vests in him the right to control the details of the work. Glasgow v. Floors, Inc., of Texas (1962), 356 S.W.2d 699, no wr. hist.; Philip Mechem, "Agency" §§ 413–416. Certainly if the right of control of details has a contractual basis, the circumstance that no actual control was exercised will not absolve the master of liability. Ballard & Ballard Company v. Lee's Administrator (1909), 131 Ky. 412, 115 S.W. 732; Philip Mechem "Agency" § 415. Conversely, an occasional assertion of control should not destroy a settled relationship agreed to by the parties.

In Smith Bros. v. O'Bryan (1936), 127 Tex. 439, 94 S.W.2d 145, it was pointed out that various definitions of the terms "independent contractor" and "master-servant" relationship have been employed. It was said that:

"The definitions formulated by the courts in many instances include, or give emphasis to, some evidentiary element which may not in all cases be a controlling factor. This is due to the fact that the presence of certain evidentiary facts is held to be controlling in certain cases, while dominant weight has been given to certain other evidentiary facts in other cases; and definitions have often been formulated in the particular case to more clearly meet the situation presented in that case."

This circumstance should be considered in passing upon the accuracy of any definition of the master-servant relationship. For example, in Southern Underwriters v. Samanie (1941), 137 Tex. 531, 155 S.W. 2d 359, it was said:

"The evidence as to the contract of employment, which was oral, throws little light on the question whether the lumber company in its employment of Samanie retained the right of control over him. It becomes necessary in the solution of the question first presented to consider not only the evidence as to the terms of the contract when made, but also the evidence with reference to the control that was actually exercised, for it is relevant and admissible as tending to prove what the contract really contemplated. Lone Star Gas Co. v. Kelly, Tex.Com.App, 46 S.W.2d

656; Note, 20 A.L.R. pp. 684, 725; 27 Am.Jur., p. 488, § 6."

Similarly, in Halliburton v. Texas Indemnity Ins. Co. (1948), 147 Tex. 133, 213 S.W.2d 677, the contract was oral and indefinite in that it could not be clearly said from the terms of the contract alone whether the parties contemplated that Halliburton should be a servant or an independent contractor. This Court said:

"Whether, under the terms of the contract, the supervisory control was exercised after the cars were loaded, or while in the process of being loaded, was a controverted fact. In other words the character of control prescribed, or retained, by Kirby Lumber Corporation, was a controverted issue. The acts of control actually exercised by the supervisors were therefore pertinent in assisting a jury in determining what the contract really contemplated."

■ In cases where there is no express contract of employment or the terms of the employment are indefinite, it may not be objectionable to include the highly important evidentiary element of "exercise of control" in the definition or issue relating to the master-servant relationship. In such cases the "exercise of control" may be the best evidence available to show the actual terms of the contract. The fact remains, however, that the "right to control" remains the supreme test and the "exercise of control" necessarily presupposes a right to control which must be related to some agreement expressed or implied. This is fundamental. See, Comment under § 1 of the American Law Institute's Restatement of the Law of Agency.

In the present case we have a written contract which, unless it was a subterfuge to begin with or has been modified by a subsequent agreement expressed or implied, definitely fixed Cargile's status as that of an independent contractor. Whoever prepared the contract undoubtedly had in mind the decision rendered in Carter

Publications, Inc. v. Davis, Tex.Civ.App. (1934), 68 S.W.2d 640, wr. ref. See also, Mid Continent Freight Lines, Inc. v. Carter Publications, Inc., Tex.Civ.App.(1960), 336 S.W.2d 885, wr. ref., and authorities therein cited. The wording was chosen with the deliberate intention of creating an independent contractor relationship. We think that the effect of the Carter-Davis decision was to establish a rule in Texas that the distribution of newspapers to individual purchasers thereof may be accomplished through the medium of independent contractors, provided, of course, that such distribution is effected under a contract similar in terms to the one considered by the court in Carter-Davis.

■ In order for there to be any certainty in business relationships and operations, it is essential that valid contracts not inhibited by considerations of public policy be scrupulously enforced. All business and mercantile activities are for the most part premised upon the legal recognition and judicial enforcement of rights, liabilities and obligations which are brought into existence through privately negotiated contracts. This does not mean, however, that the courts will enforce fictitious contracts.

■ It has been definitely established that a form of written agreement will not prevent the existence of a master-servant relationship when such contract is a mere sham or a cloak designed to conceal the true legal relationship between the parties.

The position and effect of a written agreement in connection with the existence of an independent contractor status, as contrasted with that of a servant, was considered in Texas Company v. Wheat (1943), 140 Tex. 468, 168 S.W.2d 632, wherein the case of Gulf Refining Co. v. Rogers (1933), Tex.Civ.App., 57 S.W.2d 183, wr. dis., was discussed and distinguished.

In the Wheat case the Court of Civil Appeals had held that there was a fact issue as to whether the legal relationship of master and servant existed between Texas

Company and Gossen, a gasoline filling station operator. 159 S.W.2d 238. This Court reversed and held that the written instruments involved, namely a Lease Contract, Letter Modifying Rental Clause and a Sales Contract, did not make Sam Gossen the servant of Texas Company. Gossen was the operator of a gasoline filling station and testified in some detail as to the practices employed in operating the station *in accordance with the provisions of the contracts* which he had with Texas Company. Under the view taken by this Court, such testimony did not tend to show that the plan of operations was contrary to the provisions of the written contracts. This Court said:

"Whether or not the relation of master and servant existed between the Texas Company and Gossen so as to make the doctrine of respondeat superior applicable, depends on whether the Texas Company had *the right to control* Gossen in the details of the work to be performed in the operation of the service station. Carter Publications, Inc., v. Davis, Tex.Civ.App., 68 S.W.2d 640, 641, writ refused; Lone Star Gas Co. v. Kelly, Tex.Com.App., 46 S.W.2d 656.

"The contract between the company and Gossen on its face, as evidenced by the written instruments, created the relation of landlord and tenant, and not the relation of master and servant, and we find nothing in the evidence to indicate that the contract, as written, was intended as a subterfuge or sham to conceal the existence of a different relationship. * * *

"In the case of Gulf Refining Co. v. Rogers, Tex.Civ.App., 57 S.W.2d 183, relied on by plaintiffs, there was evidence that the contract between the company and the operator of the service station was a subterfuge, and that the company not only reserved the right to control the details by which the station was to be operated, but actually assumed and exercised such control not only as to the manner in which the work was to be performed, but as to who should be employed to do the work. That case is clearly distinguishable from the case at bar."

In Elder v. Aetna Casualty & Surety Co. (1951), 149 Tex. 620, 236 S.W.2d 611, this Court reversed the Court of Civil Appeals holding that there was "no evidence that the contract (creating an independent contractor relationship) was a subterfuge, nor that it had ever been repudiated by appellant or the publisher." 230 S.W.2d 1018. The petitioner's contention (as stated by this Court) was that the Express Publishing Company, the newspaper publisher, "used the contract as a mere cloak to exercise such control over (Elder) in the details of his work as a delivery boy as to create a master-servant relationship despite the contract." This Court held that there was some evidence supporting this position and the case was remanded for a jury trial. The decision in the Elder case in no way militates against the position taken here. The evidence in Elder related directly to the control imposed upon the newspaper carrier boy. Control over others was not involved, nor was the manner of jury submission.

From these authorities we take it that the terms of the agreement between the parties is of importance in determining the existence of a master-servant relationship and that the essential inquiry is whether or not the employer has the contract right to control the opposite contracting party in the details of the work to be performed. See, Williams v. Texas Employers' Ins. Ass'n (1948), Tex.Civ.App., 218 S.W.2d 482, ref. n. r. e.

In the absence of evidence showing a different relationship between the parties, the fact that the alleged servant was performing services peculiar to the principal's business or affairs establishes prima facie that the relationship of master

and servant exists between them. McAfee v. Travis Gas Corporation (1941), 137 Tex. 314, 153 S.W.2d 442; 38 Tex.Jur.2d 492, Master and Servant § 241. When, however, the parties, as in this case, have entered into a definite contract that expressly provides for an independent contract relationship and does not vest in the principal or the employer the right to control the details of the work, evidence outside the contract must be produced to show that despite the terms of the primary contract the true operating agreement was one which vested the right of control in the alleged master. Under such circumstances, the exercise of control is evidentiary only. The true test remains the right of control. Texas Company v. Wheat (1943), 140 Tex. 468, 168 S.W.2d 632; 38 Tex.Jur.2d 490, Master and Servant § 240. The exercise of control in cases such as this is not an ultimate test of the master and servant relationship. To hold that it was, would be to practically destroy contract rights and relationships based thereon. The assumption of an exercise of control must be so persistent and the acquiescence therein so pronounced as to raise an inference that at the time of the act or omission giving rise to liability, the parties by implied consent and acquiescence had agreed that the principal might have the right to control the details of the work.

▆▆ As above pointed out, such evidence of *actual exercise* of control by Newspapers, Inc. over the details of Cargile's work was lacking. Yet, the jury could have returned an affirmative answer to Special Issue No. 1 had they believed some actual control, ever so slight in nature, was exercised over the details of Cargile's operations. In view of the testimony of Wheeless and Behrman, the inclusion of the evidentiary inquiry as to "exercise" of control, in Special Issue No. 1 was clearly prejudicial to the petitioner.

Other matters discussed by the Court of Civil Appeals need not arise upon another trial.

The judgments of the District Court and the Court of Civil Appeals are reversed and this cause remanded to the District Court for another trial.

CALVERT, C. J., and SMITH and WALKER, JJ., dissenting.

CALVERT, Chief Justice (dissenting).

A careful reading of the Court's opinion will disclose that the judgments of the Court of Civil Appeals and trial court have been reversed for one reason and one reason only: the erroneous and prejudicial wording of Special Issue No. 1. Admissibility of the testimony of the witnesses, Behrman and Wheeless, is discussed, but only as incidental to the holding that the wording of Special Issue No. 1 was erroneous. This is manifest from two sentences, one near the beginning and one near the end of the opinion. The first: "We are, however, of the opinion that in view of the evidence adduced upon the trial the independent contractor or servant issue was improperly submitted to the jury and accordingly the judgment against Newspapers, Inc. must be reversed and the cause as to the petitioner remanded for another trial." The second: "In view of the testimony of Wheeless and Behrman, the inclusion of the evidentiary inquiry as to 'exercise' of control, in Special Issue No. 1 was clearly prejudicial to the petitioner." There is also much talk in the Court's opinion about written contracts which are used as a subterfuge or which have been abandoned, but no such issues were submitted and reversal has not been ordered because of failure to submit them. Indeed, it could not have been because there was no request for the submission of such issues and no objection for failure to submit them.

Special Issue No. 1 is quoted in the Court's opinion. It inquired whether the jury found that the relationship between Cargile and Newspapers, Inc. was such that Newspapers "retained or exercised the power to control, not merely the end sought to

be accomplished, but also the means and details of its accomplishment, not merely what should be done, but how and when it shall be done." A careful analysis of the opinion will disclose that what the Court has held is that whether Newspapers "exercised the power to control" is an evidentiary and not an ultimate issue; that the "essential inquiry" in the case is whether Newspapers had "the contract right to control"; and that while the testimony of Behrman and Wheeless that Newspapers directed and controlled the details of their work would have been admissible if the issue had been worded correctly, it was not admissible as proof that Newspapers "exercised the power to control" Cargile, but may have been appropriated by the jury as such.

I agree with the Court's major thesis that in a suit for damages based upon the doctrine of respondeat superior the supreme test of the relationship between the one causing the harm and the one sought to be charged is "right of control." I agree also that Special Issue No. 1 is defective in form and does not properly submit the ultimate issue on this phase of the case, although submission in the form used is understandable in light of former expressions of this Court in Elder v. Aetna Casualty & Surety Co., 149 Tex. 620, 236 S.W.2d 611, and other cases. But a mere defect in an issue does not authorize reversal of a judgment based on the jury's answer. Under our Rules of Civil Procedure, judgments may be reversed only for *errors* committed by trial courts and Courts of Civil Appeals, which errors must have been properly preserved for review.

A trial judge does not commit *error,* as that term is used in procedural law, by merely drafting a special issue in imperfect or defective form; he commits *error* only when he overrules a proper objection to the issue and refuses to correct it to meet the objection. The first sentence of Rule 274, Texas Rules of Civil Procedure, prescribes the requisites of a proper objection. That sentence reads: "A party objecting to a charge must point out *distinctly* the matter to which he objects *and the grounds of his objection.*" [1] We have said that "The purpose of that rule is to give the trial court an opportunity to correct any errors in the charge so that the case may be properly submitted." Missouri Pacific Railroad Co. v. Kimbrell, 160 Tex. 542, 334 S.W.2d 283, 285. If the Rule is to serve its intended purpose, the opportunity given the trial judge must be a fair and reasonable one; and to that end, the requirement that the *grounds* of the objection be stated *distinctly* is to afford the trial judge an opportunity fairly and reasonably to evaluate the purported defect. In other words, the purpose of the Rule is defeated if a party may successfully urge on appeal a *ground* for his objection substantially different from the *ground* given the trial court. By like token the purpose of the Rule is defeated and the trial judge is unfairly found guilty of error if an appellate court may supply a *ground* of objection substantially different from that given by the objecting party. That, in my judgment, is what the Court has done in this case; and we have compounded our wayward action by holding the Court of Civil Appeals to have erred in failing to reverse on a ground not reasonably presented to it, or, for that matter, to us. The crucial question here, then, is: did Newspapers *distinctly* point out in its objection the *grounds* on which we have held Special Issue No. 1 defective? Or, to be more charitable, did Newspapers' objection, fairly and reasonably interpreted, advise the trial judge that it objected to Special Issue No. 1 on the grounds on which we have held it defective? I think not.

The objection cannot be properly or fairly evaluated by taking the first part of it out of context with the second part. The trial judge had to evaluate the objection as a whole. That part of the objection which

---

1. Emphasis supplied throughout unless otherwise indicated.

relates to the question under discussion reads as follows:

> "* * * and this defendant further objects and excepts to said Special Issue No. 1 for the reason that it would seek to make this defendant liable for the acts of C. E. Cargile if this defendant either retained or exercised the power to control, whereas the true test is whether or not the alleged employer has the power to control and the usurpation of such power does not make the relationship between the parties one of employer and employee or principal and agent or master and servant; and accordingly even if such special issue were answered in the affirmative no judgment could properly be rendered against this defendant thereon in view of the fact that such affirmative answer might merely mean that this defendant was exercising and professing to have the power to control which in fact it did not have under its agreement with said C. E. Cargile, and such usurpation of the right to control would not change the relationship actually existing between the parties."

If I may be credited with any power of logical analysis whatever, even the first part of the objection did not reasonably suggest to or advise the trial judge that the issue was defective because it submitted an evidentiary rather than an ultimate issue; or because the wording of the issue was such that the jury might consider testimony of actual control over Behrman and Wheeless as proof of actual control over Cargile; or because the jury could answer affirmatively if only sporadic acts rather than a persistent course of actual control over Cargile were proved. What the first part of the objection plainly said to the trial judge was that the issue was defective because the true test of the relationship between Newspapers and Cargile was "power to control," and that no amount of proof of actual control ("*usurpation* of such power," said the objection) could make the relationship that of employer and employee,

principal and agent or master and servant. Then, lest the first part of the objection be misunderstood, explanation of what was meant was deemed necessary. "Accordingly," said the last part of the objection, even if the issue were answered in the affirmative, no judgment could be rendered for the plaintiff "in view of the fact that such affirmative answer might merely mean that this defendant was exercising and professing to have the power to control which in fact it did not have *under its agreement* with said C. E. Cargile, and such usurpation of the right to control would not change the relationship actually existing between the parties." The only *agreement* which Newspapers claimed to have with Cargile was the written contract, the same in all particulars as the written contract entered into with all district managers. Thus, the second part of the objection said that the *grounds* thereof were that the issue was defective in submitting "actual control" because no "power to control" was reserved in the written contract, and no usurpation of power to control could change the relationship fixed by the contract.

With this analysis of Newspapers' objection, it seems quite clear to me that the trial court did not err in overruling it. The *grounds* of the objection were clearly unsound. As stated in the objection, the true test of the relationship between the parties is "power to control," but it is totally unsound to say that no amount of proof of actual control can establish "power to control" and a relationship of employer and employee, principal and agent or master and servant. It is equally unsound to say that because "power to control" is not reserved in a written contract, "power to control" may not be established by exercise of "actual control" or *usurpation* of the "power to control." To establish the unsoundness of these *grounds* of the objection, I need cite only Elder v. Aetna Casualty & Surety Co., 149 Tex. 620, 236 S.W.2d 611, our latest decision on the subject, although the law books are full of decided cases to the same effect. But rather than accept my

interpretation of Newspapers' objection, let us pursue the matter in the appellate courts and see what Newspapers says it meant by its objection.

The question raised by the objection was briefed in the Court of Civil Appeals under Newspapers' 7th Point of Error. After stating that Cargile was operating under a written contract making him an independent contractor, the statement and argument under the point continues: "Appellees, however, undertook to show that appellant exercised some control over Cargile beyond that *retained in the written contract* and that he was an employee for whose conduct appellant was liable. * * *" Special Issue No. 1 and a part of the objection thereto are quoted, followed by this paragraph:

"The issue as submitted to the jury permitted an affirmative answer if appellant—no matter how wrongfully—exercised [2] control over the details of the work. There is thus presented the right to control *under the agreement* between the parties as opposed to *the exercise of the power to control,* despite the fact that no such right is retained or exists."

In arguing the question as it had thus stated it, Newspapers cited and quoted from a number of decided cases in which it had been held that proof of acts of actual control *was not* legally sufficient to overcome a written contract establishing an independent contractor relationship. It then discussed other cases in which it had been held that proof of acts of actual control *was* sufficient to establish a master-servant or employer-employee relationship, the last of which is Halliburton v. Texas Indemnity Ins. Co., 147 Tex. 133, 213 S.W.2d 677, in which there was no written contract between the parties. In its opinion in the case the Court stated that evidence of actual control "is relevant as tending to prove what the contract really contemplat-

ed." With reference to that case, Newspapers said:

"It is quite plain that the Court's statement that the control actually exercised by the employer was relevant applied *only to a situation where the character of control which the employer had was controverted. It would have no application to this case or any other case where the control to be exercised by the employer is specifically set out in a written contract.*"

Finally, Newspapers summed up its argument under the point of error in these words:

"To recapitulate, it is appellant's position *that since the contract was in writing* and since it set out such control as appellant had over Cargile *the jury should have been permitted to consider only the right of control which appellant had and that they should not have been permitted to consider any control actually exercised beyond that which had been rightfully reserved.* The trial court should therefore have sustained appellant's objection to the special issue *and limited the jury's consideration to the right of control which appellant had retained.*"

The Court of Civil Appeals overruled the point of error just as the trial court overruled the objection, no doubt for the same reason. Newspapers was not asserting that the trial court erred in overruling its objection for the reasons this Court has given. It was asserting a totally different and legally unsound reason, the same unsound reason which I have stated was given as *grounds* for its objection in the trial court.

The question was briefed by Newspapers in this Court under its Second Point of Error. The point of error reads as follows:

"The Court of Civil Appeals erred in holding that petitioner's exception to

2. Emphasis the briefer's.

Special Issue No. 1 was properly overruled although said issue permitted the jury to find that Cargile was petitioner's 'agent' (defined to mean servant) if it exercised control over him, *even though such exercise of control may have been wholly without right and in violation of the written contract between petitioner and Cargile.*"

In discussing this point of error (which on its face interprets the objection to Special Issue No. 1 as I have interpreted it), Newspapers again made the meaning of its objection clear. It states:

" * * * In those cases where there is doubt as to the terms of the contract then the control actually exercised may be looked to in order to ascertain the terms. *In a case such as this, however, where the terms of the contract are admitted it is the contract which determines the relationship.*"

Again:

"If there is doubt as to the right of control, then the control actually exercised is evidentiary of the right. *Where, as here, the contract is clear the control actually exercised is immaterial.*"

And again:

"From the above authorities it is abundantly clear that Special Issue No. 1 should have been limited to the right of control which petitioner actually possessed; and that *the control which it exercised could be considered only as evidence of the relation if there had been some doubt as to the terms of the contract.*"

And once again:

"Under the above authorities they [the jury] *should not have been allowed to consider* control exercised over Cargile, and much less were they entitled to consider control allegedly exercised over Behrman and Wheeless."

It thus appears, quite clearly, that Newspapers has in the Court of Civil Appeals and in this Court, interpreted their own objection exactly as I interpret it and contrary to the way it is interpreted by the Court. Appealing litigants are entitled to fair treatment at the hands of this Court, but trial courts and Courts of Civil Appeals are also entitled to fair treatment. It is not fair treatment of those courts to hold that they have committed error in disposing of a matter when we do so upon reasons or grounds never presented to them. Nor, may I add, is it within our authority or competence under our Rules of Civil Procedure to reverse a judgment of a Court of Civil Appeals on grounds or for reasons not urged in this Court.

In two cases considered simultaneously with consideration of this case on rehearing we have held that in the absence of objection a trial court judgment may not be reversed because of the wording of a special issue, even though the wording is patently erroneous and may serve to predicate or excuse liability on a legally unsound ground. See Allen v. American National Ins. Co., Tex., 380 S.W.2d 604, and Continental Casualty Co. v. Street, Tex., 379 S.W.2d 648. It seems to me that our holding here is incompatible with our holdings in those cases. I can see no purpose in requiring objection to an issue if we may reverse on grounds not stated in the objection and not urged on appeal as a basis for reversal.

I add at this point that how the Court can have held that the jury probably appropriated evidence that Newspapers exercised control over Behrman and Wheeless as proof that it also exercised control over Cargile is hardly understandable. Cargile testified fully with respect to acts of control exercised by Newspapers over his operations, both by deposition and in person as a witness on trial. He was examined closely with respect to such matters. The only evidence of control, of any substance, over Behrman and Wheeless not otherwise

in the record as to Cargile related to the use of carrier boys. As pointed out in the Court's opinion, this evidence could not possibly be applied to Cargile's operations to show actual control since he did not use carrier boys; it may possibly have been considered by the jury as proof of "right of control," but could hardly have been considered as proof of exercise of actual control over Cargile.

In writing on rehearing the Court recognizes that the ultimate issue in this case and in other cases of this type is whether at the time of the event upon which liability must be predicated the relationship between the one causing the harm and the one sought to be charged was that of servant (employee or agent) or of independent contractor. I agree. I also agree that this matter may be submitted in separate special issues or disjunctively in one special issue.

I am somewhat concerned that the Court's opinion may be misleading in its statement that the focal point of inquiry relates to the *agreement* between the parties as it actually existed at the time of the event. It should be pointed out that the Court is not speaking of an express contractual agreement, either written or oral, but uses the term in its broadest sense as including a consensual relationship arising out of the acts and conduct of the parties. This is clearly inferable from the Court's holding that a persistent course by the employer of actual control of the conduct of one made an independent contractor by a written contractual agreement can convert the relationship into that of master and servant. This interpretation of the language in the opinion on rehearing leaves Elder v. Aetna Casualty & Surety Co., 149 Tex. 620, 236 S.W.2d 611, and other cases of like holding in full authoritative force.

Newspapers' first point of error in this Court asserts that the evidence adduced on trial is legally insufficient to support the judgment for respondents, and seeks a reversal and rendition of judgment that the plaintiffs take nothing. That point has been overruled. I agree with that action. Petitioners have five other points of error which the Court has not considered or decided; therefore, I do not feel called upon to evaluate their merit in this dissent.

For the reasons stated earlier in this opinion, I respectfully dissent.

WALKER and SMITH, JJ., join in this dissent.

## ON MOTION FOR REHEARING

NORVELL, Justice.

The philosophic basis for vicarious liability under the doctrine of *respondeat superior* does not rest upon one universally accepted theory. However, as pointed out by Philip Mechem, the rule "must satisfy some instinct of public policy, else it would not have survived so long and so vigorously." Mechem, *Outlines of Agency*, § 351.

Mechem also discusses various notions advanced to support the *respondeat superior* rule, including, among others, the Enterpriser or "Entrepreneur" theory which proceeds upon the premise that as every industry takes a more or less predictable annual toll, both of property and in flesh and blood, such toll or loss should be treated as a business cost. Mechem, § 359. This would logically raise the question of what is an industry or enterprise. Business operations may involve a myriad of activities. What is the component we should select as being the unit upon which vicarious liability should be imposed as a matter of policy? Is newspaper distribution a part of newspaper publishing, or is it an enterprise separate and apart therefrom? Is there a valid distinction between the operator of a newsstand on a city street and a distributor of newspapers in a rural area? In solving these problems, it has been suggested that some weight should be given to the practices and customs of the occupations involved and the general public attitude toward such gainful activities.

Usually, we do not think of one in domestic service as being in any other category than that of a servant; nor do we ordinarily consider a television repairman as being anything other than an independent contractor in his relationship to the householder who requires his services. This is true even though the employer, in one instance, gives no direction as to cleaning a house, or, in the other instance, the employing householder is quite specific as to the details of testing tubes, amplifiers and the like. The concept of control is often an elusive thing, Mechem §§ 414 et seq., and under certain circumstances the prevailing legal test of "control of the details of the work" may leave something to be desired in differentiating between the servant and the independent contractor.

■■■■ However that may be, it is certain that in a contractual agency, vicarious liability is founded upon the status created by the agreement. Important legal rights and consequences are predicated upon the relationship thus created, such as liability for social security taxes, the right to workmen's compensation benefits, the responsibility of the master for the torts of the servant, and the like. As long as we say that newspaper distribution may be accomplished by either the employment of an independent contractor or a servant, it becomes highly important that the jury as the trier of facts be properly instructed in regard to the distinguishing feature between the servant and the independent contractor, which under present standards depends upon whether or not the employer has the *right* to control the details of the work. It is not determined by sporadic acts of control.

The focal point of inquiry relates to the actual operative agreement as it existed at the time of the event upon which liability is sought to be imposed. If such agreement at that time created the status of master and servant between the parties, then the law, as a matter of public policy, will hold the master accountable for the wrongful acts of the servant. We again emphasize that this is not a case where the supposed master was directly controlling the actions of the servant at the time of the commission of the act upon which the claim of liability is based.

■■■■ It was stated at the beginning of the original opinion that the crucial issue in this case is whether the relationship of C. E. Cargile to Newspapers, Inc., was that of a servant or an independent contractor. A highly important evidentiary matter bearing directly upon the crucial or controlling issue is whether the written contract between Newspapers, Inc., and Cargile was a subterfuge or whether it had been abandoned in whole or in part insofar as the *right* to control the details of the work is concerned. While it is not our purpose to prescribe any set form of issue which should be submitted in this case or in those presenting similar factual situations, it has been suggested that when one of two alternatives must be correct, it is permissible to use an alternative or "rather than" form of submission, with correct instructions and definitions of terms and a proper placing of the burden of proof. Rule 277, Texas Rules of Civil Procedure; Rice v. Thompson, Tex.Civ.App. (1951), 239 S.W.2d 137, n. r. e. Of course, two separate issues may be employed as was done in this case. Cf. McDonald, *Texas Civil Practice*, § 12.06. As indicated in Smith Bros. v. O'Bryan, (1936) 127 Tex. 439, 94 S.W.2d 145, the evidentiary elements of a case have an important bearing on the form of submission which should be employed.

We adhere to the views set forth in our original opinion, and respondent's motion for rehearing is overruled. Labatt, *Master and Servant* (2d ed.), § 64.