**MILES HOMES DIVISION, INSILCO CORPORATION, Appellant,**

v.

**Leonard E. SMITH and Wife Christine Smith, Appellees.**

**No. 09–88–236 CV.**

Court of Appeals of Texas, Beaumont.

May 17, 1990.

Rehearing Denied June 21, 1990.

Brack Jones, Jr., Homer Stephenson, Moore, Landrey, Garth & Jones, Beaumont, for appellant.

Thomas P. Roebuck, Jr., Beaumont, for appellees.

## OPINION

BURGESS, Justice.

Leonard E. Smith and Christine Smith (Smith) sued Miles Homes Division, Insilco Corporation (Miles) for fraud, negligence, and violations of the Deceptive Trade Practices Act. Judgment entered on the jury verdict awarded Smith $50,733 actual damages for fraud, $250,000 exemplary damages, and $50,000 attorneys fees with additional attorneys fees in the event of appeal. Miles raises twenty points of error on appeal. We address these points out of order.

The Smiths purchased a build-it-yourself home from Miles in 1982. They executed a Retail Installment Contract and a Builder's and Mechanic's Lien Contract with Power of Sale. The house was never completed. Smith alleged misrepresentations in Miles' sales brochures and statements made by John Erickson, Miles' sales representative, regarding the value of the structure on completion, availability of permanent financing and the amount of monthly payments.

■ When considering legal sufficiency or "no evidence" points, we consider only the evidence, and reasonable inferences therefrom, which viewed in its most favorable light supports the finding and disregard all evidence and inferences to the contrary. *Garza v. Alviar*, 395 S.W.2d 821 (Tex.1965). If there is any probative evidence to support the finding, the point must be overruled. *Id.* In a factual sufficiency challenge, we consider all of the evidence including that which is contrary to the verdict. *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660 (1951). We may sustain a factual sufficiency point only if we determine that the finding of a vital fact is so contrary to the great weight and preponderance of the evidence as to be clearly wrong and unjust. *Id.*

■ Points of error seventeen through nineteen aver the legal and factual insufficiency of the evidence that John Erickson was Miles' agent and not an independent contractor. Erickson was a salesman exclusively for Miles. Miles provided him with job training. Appellant concedes he had the authority to explain products, financing, materials, delivery and credit. He negotiated the sale for Miles and executed the contract on its behalf. The contract did not state that the sales representative's authority was subject to any limitations.

The sales representative contract between Miles and Erickson states the salesman shall have sole control over the manner and means of solicitation and sales and be an independent contractor. It also provided for submission of all advertising copy for prior approval and stated the salesman shall make full disclosure of all material facts concerning Miles Homes. Miles received the benefit of the transaction. . There is sufficient evidence Erickson acted as Miles' agent in procuring the Smith contract.

Miles contends Erickson's status as an independent contractor was fixed by the written agreement, citing *Newspapers, Inc. v. Love*, 380 S.W.2d 582 (Tex.1964). That case involved a suit for personal injuries arising from an accident. Here, Miles held Erickson out as its representative and accepted the benefits of the transaction induced by fraud. *See Duval County Ranch Co. v. Wooldridge*, 667 S.W.2d 887 (Tex. App.—Austin 1984, writ dism'd w.o.j.) Points of error seventeen, eighteen and nineteen are overruled.

■ Point of error one argues there is no evidence to support the jury finding of $50,733 actual damages. The measure of damages for fraud at common law is the difference between the value of that which he has parted with and received. *Leyendecker & Associates, Inc. v. Wechter*, 683 S.W.2d 369 (Tex.1984). Smith contends actual damages are determined by adding the debt owed to Miles, the value of the encumbered land, the amount expended on the slab, and the cost of completion, less the fair market value of the property as it now exists. This method of calculation is incorrect because it considers both the cost of completion and the lower value of the property due to its incomplete state. Smith owes $36,883 on the property. The value of the encumbered land is $3,500. Smith expended $1,500 installing the slab. The fair market value of the property is $19,600, leaving actual damages in the amount of $22,283. Point of error one is sustained.

Since we sustain point of error one, we do not reach points of error two, three, four, and sixteen.

■ Points of error five through seven and nine through fourteen attack the sufficiency of the evidence to support an action for fraud. The elements of fraud are:

(1) that a material representation was made; (2) that it was false; (3) that, when the speaker made it, he knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion; (4) that he made it with the intention that it should be acted upon by the party; (5) that the party acted in reliance upon it; (6) that he thereby suffered injury.

*Trenholm v. Ratcliff*, 646 S.W.2d 927 (Tex. 1983). Miles argues the alleged representations were not of past or existing material facts but were mere statements of opinion. Miles' brochures state Miles would help its customers get long-term financing. They also stress their product builds equity. Mr. Smith testified Erickson told them they would be able to obtain permanent financing on the completed home and the monthly payments on the permanent loan would not exceed $400. He stated they in fact could not obtain permanent financing and the monthly payments would exceed $700. Mr. Erickson testified he made the representation about the monthly payment, but conditioned the representation on the financing of substantially less than the amount provided for in the contract. Smith denied Erickson disclosed the condition. Smith stated he relied on the brochures and Erickson's representations in entering the contract. There is sufficient evidence to support an action for fraud. Points of error five through seven and nine through fourteen are overruled.

Point of error fifteen argues Smith failed to plead and obtain jury findings that the value of the building supplies received was less than the value as represented. The sales brochures characterized the product as more than raw lumber and nails, but a home. The proper measure of recovery discussed under point of error one does not require such findings. Further, Miles did not raise this objection to the broad jury question on actual damages and thus presents nothing for review. TEX.R.

CIV.P. 274. Point of error fifteen is overruled.

■ Point of error eight urges there are no jury findings which support an action for fraud. Miles argues there is no jury finding that Miles or its salesman knew that any of the representations found by the jury to be false were false at the time they were made, or that they were made recklessly and without knowledge of the truth. The jury question asked:

> Do you find from a preponderance of the evidence that the Defendant, MILES HOMES DIVISION OF INSILCO CORPORATION, committed fraud in committing any of the foregoing acts or omissions to which you have answered "We Do".

Miles did not object to the submission of this issue or to the attached definition of fraud on the grounds that one or more of the elements necessary to sustain the ground of recovery was omitted from the charge. Any omitted element is thus deemed found by the court in such manner as to support the judgment. TEX.R.CIV.P. 279. Point of error eight is overruled.

■ Point of error twenty avers the award of exemplary damages is excessive. Miles contention that exemplary damages are statutorily limited to twice the amount of actual damages by TEX.BUS. & COM. CODE ANN. sec. 27.01 (Vernon 1968) is without merit. This fraud statute neither supersedes the common law rule nor provides an exclusive remedy for the recovery of damages in an action based on fraud in a transaction involving real estate. *Ratcliff v. Trenholm*, 596 S.W.2d 645 (Tex.Civ.App.—Tyler 1980, writ ref'd n.r.e.). We need not address Miles' claim that section 27.01 might be applicable to transactions of this type.

■ The amount of exemplary damages awarded rests largely in the discretion of the jury; unless the award is so large as to indicate it is the result of passion, prejudice or corruption, or that evidence has been disregarded, the verdict of the jury is conclusive and will not be set aside as excessive. *Morgan v. Arnold*, 441 S.W.2d 897 (Tex.Civ.App.—Dallas 1969, writ ref'd

n.r.e.). Factors to consider in determining whether an award of exemplary damages is reasonable include (1) the nature of the wrong, (2) the character of the conduct involved, (3) the degree of culpability of the wrongdoer, (4) the situation and sensibilities of the parties concerned, (5) the extent to which such conduct offends a public sense of justice and propriety. *Alamo National Bank v. Kraus*, 616 S.W.2d 908 (Tex.1981). Miles argues if the award of actual damages was not supported by the evidence, this award must also be excessive. We disagree. Exemplary damages are not necessarily multiples of actual damages. The ratio of actual damages to exemplary damages is not so great as to render the exemplary damages excessive in light of the facts of the case. *See Lee County Nat'l Bank v. Nelson*, 761 S.W.2d 851 (Tex.App.—Beaumont 1988, writ denied). Point of error twenty is overruled.

Point of error one is sustained. We do not reach points of error two, three, four, or sixteen. The remaining points of error are overruled. If remittitur of $28,450 is filed within fifteen days, the judgment will be reformed to show actual damages of $22,283. If such remittitur is not filed, then the judgment shall be reversed and remanded. TEX.R.APP.P. 85.

AFFIRMED AS REFORMED WITH REMITTITUR.

BROOKSHIRE, Justice, dissenting.

This dissent is respectfully filed. The majority of the court writes that the Smiths [Plaintiffs below—Appellees herein] purchased a "build it yourself" home from Miles Homes Division of Insilco Corporation [Defendant below—Appellant herein] in 1982. The Court wrote that Mr. and Mrs. Smith executed a Retail Installment Contract and a Builder's and Mechanic's Lien Contract with Power of Sale.

The majority then recognized that this litigation was a cause of action based on a contract and that a Builder's and Mechanic's Lien Contract was involved. The lien, of course, was on real estate. The materials, which were contracted for, were

**386**

shipped to, and received and accepted by, the Appellees who began construction on the house and land involved. The Smiths pleaded the contract involved a "do-it-yourself" packaged home, complete with instructions and diagrams or blue prints for construction.

In fact, the live pleadings of the Plaintiffs affirmatively set out that, on or about September 10, 1982, they (Mr. and Mrs. Smith) entered into a *retail, installment contract* "wherein the Defendant, for and in exchange of the sum of $28,501.00 plus interest of $5,700.00, agreed to provide materials for the construction of a home on the Plaintiffs' property."

The Plaintiffs further pleaded that, on or about October or November 18, 1982, the Plaintiffs and the Defendant entered into a Builder's and Mechanic's Lien Contract providing that the Defendant was to provide certain lumber and building materials for the construction of a home on the Plaintiffs' property located in Orange County. The Smiths received and accepted two shipments of materials. This Builder's and Mechanic's Lien Contract was recorded in the records of the County Clerk of Orange County in Volume 113, Page 265.

It is clear, then, that this lawsuit involved and was based upon a written contract and a Builder's and Mechanic's Lien between the contracting parties. Although the Smiths were later dissatisfied, no attempt was made to rescind the contract because of any fraud in the inducement thereof. One of the major thrusts of the Plaintiffs' pleadings was that John Erickson had represented to the Smiths that their home would be worth the sum of $75,000.00 to $80,000.00 upon completion. The jury found adversely to the Smiths on this allegation.

The Plaintiffs pleaded another major thrust to the effect that contrary to the Defendant's; that is, Miles Homes Division of Insilco Corporation's contractual obligations, the materials were of poor quality and did not conform to the materials required in the package and the *Plaintiffs specifically pleaded that the Defendant had breached its contractual obligation to the Plaintiffs.* The Plaintiffs also pleaded for a reasonable attorney's fee because of the Defendant's breach of the contract. Hence, under the pleadings and under the evidence and record, in a natural and in a necessary sense, this was a suit to recover for breach of contract and intimately involved real estate.

Under the "fraud theory" of Plaintiffs, the jury returned these special findings. Whether they are supported by any evidence of probative evaluation is discussed later. The findings were:

1. That the Appellant failed to disclose information concerning the goods and services which was known at the time of the transaction.

2. That the Appellant advertised goods and services with the intent not to sell them as advertised.

3. That the Appellant misrepresented the authority of the salesman, representative or agent to negotiate the final terms of a consumer transaction.

4. That the Appellant told the Appellees that, upon completion, the house notes would not exceed $400.00 to $450.00 per month.

5. That the Appellant represented to the Appellees that they would be able to obtain permanent financing at completion of construction.

6. That the Appellant did not make the representation to the Appellees that the value of the house, when completed, would be $75,000.00 to $80,000.00 (as found in Special Issue No. 10).

7. That Appellant committed fraud in committing the foregoing acts or omissions (Special Issue No. 10a).

8. That such fraud was a proximate cause of the damages to the Appellees (Special Issue No. 11).

9. That the sum of $50,733.00 would reasonably compensate Appellees for their actual damages (Special Issue No. 12).

10. That the Appellant should be required to pay exemplary damages to the Appellees (Special Issue No. 13).

11. That the Appellant should be required to pay Appellees the sum of $250,000.00 as exemplary damages (Special Issue No. 14).

Assuming, without deciding, for the purposes of this dissent whether there was any evidence, or no evidence, to support these findings, it is abundantly clear that each of the first six findings is a breach of the contract and is not an independent tort or cause of action. Each one of the first six findings is intimately related to the contract between the parties and each one is part and parcel, innately and inherently, in and of the contract; each sounds in contract. A careful reading of each of the basic, operative findings shows that each is directly connected to the contract and each is not separate, distinct or independent of the contract. Four of six findings deal with promises or agreements relating to the contract to predict certain acts in the future. These will be dealt with further later.

These four findings, if anything, are simply promises or predictions that did not occur in the future, *being breaches, at most, of the contract.* It is a well-established rule in Texas, and has been for many years, that *exemplary damages cannot be recovered in an action for breach of contract. Texas Nat. Bank v. Karnes,* 717 S.W.2d 901 (Tex.1986). See and compare *Leyendecker & Associates, Inc. v. Wechter,* 683 S.W.2d 369 (Tex.1984). The Court's opinion, I think, attempts to overrule several well-established Supreme Court decisions. The Supreme Court, in *Texas Nat. Bank v. Karnes, supra,* held as follows, at page 903:

"Punitive damages are not recoverable for breach of contract. *Jim Walter Homes, Inc. v. Reed,* 711 S.W.2d 617, 618 (Tex.1986); *Bellefonte Underwriters Ins. Co. v. Brown,* 704 S.W.2d 742, 745 (Tex.1986); *Amoco Prod. Co. v. Alexander,* 622 S.W.2d 563, 571 (Tex.1981). The party seeking punitive damages must obtain at least one finding of an independent tort with accompanying actual damages. *Jim Walter Homes,* 711 S.W.2d at 618; *Bellefonte Underwriters Ins. Co.,* 704 S.W.2d at 745. The court of appeals exceeds its authority when it implies a finding of actual damages in tort because a court of appeals cannot make original findings of fact, it can only 'unfind' facts. *Id.; City of Beaumont v. Graham,* 441 S.W.2d 829, 832–33 (Tex.1969).

"In this case, actual damages were awarded in connection with only one issue—the bank's failure to dispose of the collateral in a commercially reasonable manner. If this issue sounds in contract, no punitive damages should have been awarded.

"The disposition of repossessed collateral must be commercially reasonable. Tex.Bus. & Com.Code Sec. 9.504 (Vernon Supp.1986). This provision is an implied covenant in all contracts governed by Article 9. Tex.Bus. & Com.Code Sec. 9.102 (Vernon Supp.1986). Thus, the bank's breach of this implied covenant gave rise to a cause of action which sounds in contract. Tex.Bus. & Com. Code Sec. 9.507 (Vernon Supp.1986); *see, e.g., First City Bank v. Guex,* 677 S.W.2d 25, 30 (Tex.1983); *Sheppard Federal Credit Union v. Palmer,* 408 F.2d 1369 (5th Cir.1969)."

The paramount and governing authority in this appeal, in my opinion, is *Texas Nat. Bank v. Karnes, supra.*

Hence, the majority opinion conflicts with the opinions of the Supreme Court of Texas in *Texas Nat. Bank v. Karnes, supra; Jim Walter Homes, Inc. v. Reed,* 711 S.W.2d 617 (Tex.1986); *Bellefonte Underwriters Ins. Co. v. Brown,* 704 S.W.2d 742 (Tex.1986), and *Amoco Production Co. v. Alexander,* 622 S.W.2d 563 (Tex.1981).

A careful reading of the jury's special findings on the "fraud" issues, which are in reality breach of contract issues, shows that the *Smiths did not obtain findings of an independent tort with accompanying actual damages as distinguished from breach of contract or failure to keep promises* or agreements. *Texas Nat. Bank v. Karnes, supra.* Hence, the punitive damages awarded by the trial court, and affirmed by the majority here, in the amount of $250,000.00, is contrary to well-

established, decisional law. Inasmuch as the majority has affirmed the award of $250,000.00 exemplary damages, this dissent is respectfully filed.

The natural and only case between these parties was based upon a written contract and a Builder's and Mechanic's lien written contract or instrument and every one of the jury's findings dealt with by the majority as "fraud" necessarily established a cause of action in contract and sounding in contract. *Texas Nat. Bank v. Karnes, supra.* Hence, the $250,000.00 exemplary or punitive damages, under this record, and under the findings of the jury, cannot stand. It is significant and crucial that the six acts or omissions, inquired about in Special Issue No. 10, are as follows:

"(1) In failing to disclose information concerning the goods and services which was known at the time of the transaction...."

This is directly and necessarily a breach of contract and a breach of the covenant which sounds in contract.

"(2) In advertising goods or services with intent not to sell them as advertised."

Again, this is a breach of contract and sounds in contract. It is a promise or prediction of a future event.

"(3) In misrepresenting the authority of the salesman, representative or agent to negotiate the final terms of a consumer transaction."

The consumer transaction was a contract.

"(4) That the value of the house when completed would be $75,000 to $80,-000."

To this, the jury found "we do not", thereby returning a special verdict adverse to the Smiths.

"(5) That upon completion the house note would not exceed $400.00 to $450.00 per month."

This was an alleged prediction concerning a future event which will be dealt with hereinafter. Nevertheless, it sounds in contract.

"(6) In representing that the Plaintiffs, LEONARD and CHRISTINE SMITH, would be able to obtain permanent financing on the home, as represented, at the completion of construction, when in fact they could not obtain such permanent financing."

This, again, is an alleged prediction concerning a future event. Nevertheless, it definitely sounds in contract. The trial court's judgment is based solely on these six findings. The Court, I maintain, erroneously affirmed the $250,000.00 smart money award. Since the Court eviscerates the holdings in *Texas Nat. Bank v. Karnes, supra,* I must dissent.

### The Independent Contractor Issue

In the original brief, filed by the Appellant, Miles Homes, several points of error maintain that John Erickson was acting as an independent contractor at the time of this transaction and that there was no evidence to support the jury finding that Erickson was acting as an agent. In the alternative, Appellant states there was insufficient evidence that Erickson was acting as an agent and not as an independent contractor and this finding was against the great weight and preponderance of the evidence. These three points were properly set forth with ample, adequate and meaningful statements of facts, argument and authorities. There was a correct, referenced statement of facts set out under these three points of error, being Appellant's Points of Error 17, 18 and 19.

The record clearly reflected that Erickson was not empowered or authorized to represent to the Appellees that their home would be worth $80,000.00 to $75,000.00 when completed. Nor was Erickson authorized to represent to the Appellees that their note would not exceed $400.00 to $450.00 per month. At most, Erickson predicted this amount as a future event based on the Smiths' deliberate choice to buy certain materials and fixtures locally at a cheaper or wholesale rate. This prediction was conditionally based on the Smiths' future actions. Erickson was paid in the same manner as a real estate representative is paid; that is, when the building materials were delivered, Erickson would receive his commission. The Appellant did

not take out worker's compensation on Erickson; nor did it withhold federal income taxes from his commissions; nor did it withhold social security taxes. Furthermore, an independent contractor representative situated, as was Erickson, would simply not have the authority to buy a car on the credit of the Appellant or to sign the Appellant's name to a note, nor was Erickson authorized to give rebates.

Furthermore, the written contract between the Appellant herein and Erickson, which was admitted into evidence in the record, bearing date August 15, 1981, provides as follows:

"You shall have sole control over your time and the manner and means of solicitation of sales; be an Independent Contractor and not an employee of Miles Homes; and bear all expences [sic] incidental to your sales efforts, including but not limited to transportation, telephone, postage, and printing. You shall also be solely responsible for paying all applicable federal and state taxes, such as self employment and social security taxes, incurred as a result of your status as an Independent Contractor."

Erickson also affirmed that, under his contract with the Appellant, he, (Erickson), was an independent contractor and an independent sales representative and his responsibilities included the *securing of contracts* for the sale of Appellant's materials. Erickson further testified that he was responsible for his own expenses and that the Appellant withheld no social security taxes. In fact, he paid his own taxes, his own insurance and the premiums for his own medical benefits and that he could not reduce, or rebate, on the price of the products of Miles Homes.

Erickson swore he told Appellees he was a representative for Miles Homes and that was all he related to them. A written contract followed. Each contract determined, prima facie, Erickson's status as that of an independent contractor.

The able counsel for the Appellees proved up by the first witness that he called to the stand all the elements of an independent contractor. *Newspapers, Inc.*

*v. Love,* 380 S.W.2d 582 (Tex.1964). Appellant and Erickson executed a written contract. It fully established Erickson's status as that of an independent contractor. All the necessary prerequisites to determine this status are present. Appellees failed to plead, prove and obtain findings that the contract was mere subterfuge or that it had been changed by a later agreement either express or implied. His status had not changed. *Newspapers, Inc., supra,* holds that Appellees, here, had the burden to show that the written contract between Miles Homes and Erickson was inoperative or that the contract had been abandoned by both of them. When Miles Homes and Erickson have entered into a definite written contract that clearly provides for an independent contract relationship, evidence outside the contract must be produced to demonstrate that, despite the clear provisions of the written contract, the true operating agreement was one that actually vested the right to control the details in Erickson. The proof involved must be so persistent and so pronounced as to raise an issue that Miles Homes and Erickson had agreed that Erickson had the right to control the details. *Id. Newspapers, Inc., supra,* has been cited and followed by recent authorities. *Dutcher v. Owens,* 647 S.W.2d 948 (Tex.1983); *Home Interiors & Gifts, Inc. v. Veliz,* 695 S.W.2d 35 (Tex. App.—Corpus Christi 1985, writ ref'd n.r. e.); *Parker v. Enserch Corp.,* 776 S.W.2d 638 (Tex.App.—Dallas 1989, writ granted); *Sherard v. Smith,* 778 S.W.2d 546 (Tex. App.—Corpus Christi 1989, no writ history). Since the majority declines to adhere to *Newspapers, Inc., supra,* and its progeny, I dissent. Moreover, Appellees fail to challenge the statements made by the Appellant in its original brief as to the facts or the record under Appellant's points of error dealing with the independent contractor issue. TEX.R.APP.P. 74(f).

*The Special Issue No. 10 Question*

Special Issue No. 10 is as follows:

"SPECIAL ISSUE NO. 10

"Do you find from a preponderance of the evidence that Defendant, MILES

HOMES DIVISION OF INSILCO CORPORATION, committed any of the following acts or omissions:

"Answer 'We do' or 'We do not.'

ANSWER

"(1) In failing to disclose information concerning the goods and services which was known at the time of the transaction, if such failure to disclose such information was intended to induce the Plaintiffs into a transaction into which they would not have entered had the information been disclosed;

WE DO

"(2) In advertising goods or services with intent not to sell them as advertised;

WE DO

"(3) In misrepresenting the authority of the salesman, representative or agent to negotiate the final terms of a consumer transaction;

WE DO

"(4) That the value of the house when completed would be $75,000 to $80,000;

WE DO NOT

"(5) That upon completion the house note would not exceed $400.00 to $450.00 per month;

WE DO

"(6) In representing that the Plaintiffs, LEONARD and CHRISTINE SMITH, would be able to obtain permanent financing on the home, as represented, at the completion of construction, when in fact they could not obtain such permanent financing.

WE DO"

Special Issue No. 10a inquired of the jury if the Defendant MILES HOMES committed fraud in committing any of the foregoing acts or omissions in Special Issue No. 10. Special Issue No. 10a is obviously insufficient. Then, Special Issue No. 11 asked:

"Do you find from a preponderance of the evidence that such fraud, if any, was a proximate cause of the damages to the Plaintiffs, LEONARD and CHRISTINE SMITH?

"Answer 'We do' or 'We do not.'

"ANSWER: WE DO"

It is lucidly clear, from the manner and method in which the jury was charged in this case, considering especially Special Issue No. 10, Special Issue No. 10a and Special Issue No. 11, that it is impossible to ascertain which one or more of the acts or omissions were actually found by the jury to have been "fraud". This is because of the specious wording of Special Issue No. 10a. Also, it is impossible to determine which acts or omissions or what "fraud" was a proximate cause of the damages. This is obviously true because of the specious wording of Special Issue No. 11. There certainly exists no probative evidence that the corporation, itself, committed any alleged act of fraud. In an interpretation most favorable to the Smiths, it is clearly demonstrated by this record that the first three acts or omissions related to acts by the corporate appellant, itself. These are:

"(1) In failing to disclose information concerning the goods and services *which was known at the time of the transaction, if such failure to disclose such information was intended to induce the Plaintiffs into a transaction into which they would not have entered had the information been disclosed;*

"(2) In advertising goods or services *with intent not to sell them as advertised;*

"(3) In *misrepresenting the authority* of the salesman, representative or agent to negotiate the final terms of a consumer transaction." (Emphasis added)

There exists no evidence as to what, if any, information concerning the goods and services that the Appellant, Insilco, failed to disclose. It is lucidly clear that the issue, as drawn, is so vague and general that it gives no indication or even hint as to what failure, if any, or what undisclosed information, if any, was actually being inquired about.

Secondly, there is no evidence in this record that the goods and services were advertised *with intent not to sell them in*

*the future as advertised.* That necessarily involves a promise to be performed in the future. But, clearly, (1) and (2) above are simply breaches of the contract. Even if the same had evidence to support them, they simply do not create an independent, separate and distinct tort—apart from the contract *and not sounding in contract*— upon which exemplary damages could be awarded and the same is true, by logical reasoning, as to subsection (3) of Special Issue 10, reading:

> "(3) In misrepresenting the authority of the salesman, representative or agent to negotiate the final terms of a consumer transaction."

As to subsection (2), of Special Issue 10, the language and wording used in that subsection gives no hint or indication as to what goods or what services were inquired about.

From the relevant contract involved, and considering the entire record, there exists no evidence to sustain a "We Do" answer to subsection (3) of Special Issue No. 10. The corporation was located and operated in the State of Minnesota. The contract with the Smiths, made the basis of this litigation, was entered into in Orange County, Texas, and the construction of the house was to be performed there. No "misrepresenting the authority" of Erickson is shown.

As to Special Issue 10, subsection 6, there is simply no evidence in the record that the Appellees could not get permanent financing. Indeed, Leonard Smith testified that he could get permanent financing. A careful, analytical reading of Mr. Leonard Smith's testimony was that he was not complaining that he could not get financing. What he said was that he did not feel like he could afford to finance certain extra materials and yet these were items that he elected not to purchase from Miles Homes and had not intended to purchase from Miles Homes. Mr. Smith, at his own option, had elected to obtain these extra materials from other sources or suppliers. He stated he could buy them cheaper and at wholesale.

The record contains nothing that shows that the corporate Appellant ever misled the Appellees about the Appellees' ability to get permanent financing. Mr. Smith admitted that he really was not complaining about the quality of the building material that was sent to him and, as an example:

> "MR. JONES:
>
> "Q — Defendant's impliedly warranted that the goods were fit for the ordinary purpose. You're not complaining about that, are you?
>
> "A As best I can understand it, I don't guess. I don't understand all those words."

In summary, Mr. Smith was ultimately complaining about the fact that the house would not appraise for between $75,000.00 and $80,000.00 upon completion. The jury found adversely to the Smiths on that issue. The Smiths' other real complaint was that Erickson had told them that the notes would not be over $400.00 to $450.00 per month. Under this record, there is nothing that connects the Appellant to any of the acts or omissions complained about and submitted to the jury.

### The Issue of the Amounts of the Monthly Installment Payments

The Appellees, in their brief, take the position that Mr. Leonard Smith testified that Mr. Erickson told him (Smith) that the mortgage payments by the month would not be over $400.00 to $450.00 and, more importantly, Mr. Erickson essentially confirmed Mr. Smith's statements regarding the monthly mortgage payments. Erickson's testimony on this point actually reveals itself thusly and to the contrary. The record shows as follows:

> "Q Previous testimony has shown that you told them the monthly note would not exceed four hundred and fifty dollars, or four to four hundred and fifty dollars.
>
> "A They expressed to me their desire to keep their payments under that amount, under that four hundred and fifty dollar amount, and I explained to them *that if they were to get the fin-*

ishing materials locally and they did that out-of-pocket that, yes, they could keep that, reach that goal, have their payments under four-fifty.

"Q Did they ever indicate anything with regard to interim financing?

"A They did not.

"Q Defendants' No. 5 and 21 are the same, but they're checked on the reverse side. Were you visiting with the folks when that was filled in, sir?

"A Yes, I was.

"Q What did they tell you when they checked that?

"A That they were willing to do all the work themselves; that they were going to do all the work themselves.

"Q When you talked about interim financing, did you have this sheet with you? (Indicating.)

"A Yes, I did.

"Q Who filled out this sheet? Did one of the Smiths?

"A Yes, one of the Smiths filled out the sheet.

. . . .

"Q Did you talk with them about this particular statement? (Indicating.)

"A Yes, I did.

"Q And it reads: 'Will you receive cash assistance from anyone,' and the answer is, "No."

"A Right.

"Q What did they tell you about that?

"A You know, he explained to me that with his welding and, you know, the monthly payments that he would have on the house, *he felt like he could go ahead and finish the home and buy the material locally and pay for that cash.*" (Emphasis added)

Further in the record we find:

"Q Did the four hundred to four hundred and fifty dollar situation come up more than once?

"A Yes, it did.

"Q Who was the person bringing that up the most?

"A The most, Mrs. Smith.

"Q And what did she tell you?

"A She was very concerned that, you know, the payments would not be more than that, and I explained to her over again that they could keep their payments under four, four-fifty a month *as long as they only financed the basic package of the home and the foundation system.*

"Q Did you ever tell them the home, when completed after *all the furnishings were in the home, the value would be seventy-five to eighty thousand dollars?*

"A *No, I did not.*"

Also, the following:

"Q Did you represent to them that the house note—now I don't want to be duplicitous—would be four hundred to four hundred and fifty dollars a month?

"A *Again, as long as they were to keep that, the extra items, out of their permanent financing, yes, they did.*" (Emphasis added)

This testimony by Erickson does not confirm the Smiths' statements, but, rather, denies the Smiths' statements. The evidence given by Erickson makes it glaringly clear that the Appellees could keep their permanent, monthly notes under the $400.00 to $450.00 per month cap so long as the Appellees financed only the basic package to the home, which amounted to $28,501.00, plus the foundation assistance. The Smiths preferred this type of contract.

The Appellant maintains that, taking appropriate judicial notice and knowledge of arithmetical and mathematical computations, the monthly payments on a loan of $31,500.00—being within one dollar of the total of $28,501.00 and $3,000.00—for twenty years, at 10% interest, would be in the amount of *$304.00*. Mr. Smith had mentioned a twenty-year loan and the 10% interest rate is the rate of interest that the Appellees had agreed to pay over the two-year period during the construction of the home. Other amortizations would show that the monthly payment on a loan of $31,500.00 for 25 years, at 10% interest, would be *$286.26* and that monthly payments on a loan of $31,500.00 for 30 years,

at 10% interest, would amount to *$276.45*. Even the monthly payments on a loan of $31,500.00, for 20 years, at the very high rate of interest of 14%, would amount to, in monthly installments the sum of *$391.72*. For 25 years, at 14%, the installments would be $379.19 or, for 30 years, at 14% interest, would result in a monthly payment of *$373.25*. These calculations have been rechecked by computer and amortization schedules and the same are correct within $1.00 difference.

Upon reviewing the whole record, this is not a case for punitive damages. With respect and concern, I must disagree with the $250,000.00 punitive award granted by the majority; the entirety of the record disallows it. No probative evidence exists to sustain the jury's special finding on permanent or interim financing; nor does probative evidence inhere in the record on the $400.00 to $450.00 monthly installment cap issue.

### The Elements of Actionable Fraud

In Texas, the necessary elements of actionable fraud were clearly enumerated in *Wilson v. Jones*, 45 S.W.2d 572 (Tex. Comm'n App.1932, holding approved). The following elements must appear: (1) that a material representation was made; (2) that it was false; (3) that, when the speaker made it, he knew it was false or made it recklessly without any knowledge of its truth and as a positive assertion; (4) that he made it with the intention that it should be acted upon by the party (hearer); (5) that the party acted in reliance upon it; and, (6) that the party thereby suffered injury. Each one of these necessary elements or bases must be established with a reasonable degree of certainty and the absence of any one of them will totally defeat a recovery. *Wilson, supra.*

It is interesting and significant to note that the rule on actionable fraud does not make a speaking party responsible for every unauthorized, erroneous or false misrepresentation made to the other (the hearer), although the representations may have become injurious. *Id.* The element *"that it was false"* clearly indicates a *represen-tation involving a past or present fact.* To be remedial fraud, the false representation must be one of fact as distinguished from an expression of an opinion; opinions or predictions about future events are not actionable. There is simply no evidence that any one or more of the representations found by the jury on the alleged fraud cause of action *were false or were recklessly made, without any knowledge of its truth and as a positive assertion.* Certainly there is a dearth of evidence that any representation or prediction of a future event found by the jury was made when the speaker who made it knew that it was then false. The expression of an opinion, or a prediction about a future event is not presumed to deceive, mislead or to influence the judgment of the hearer; hence, the hearer has no right to rely upon same. Thus, the hearer has no right to recover.

Some relaxations of this rule have taken place but the relaxations are strict and limited. The expression of an opinion or a prediction may constitute fraud where the speaker *purports to have special knowledge of facts that will actually occur or exist in the future.* There is no evidence that the expressions of opinions or predictions of any future event were spoken where the speaker had, or purported to have, special knowledge of *facts that will occur or exist in the future.* This requirement is absent.

Although the judgment recites that it is based on fraud, a careful reading of the court's charge, itself, concerning the definition of "fraud", coupled with the jury's findings on "fraud", clearly demonstrates that there is no finding by the jury that the Appellant, or Erickson, knew that any of the said representations (found by the jury on the fraud theory) were false at the time the same were made, if they were made; and, further, there exists no finding that any opinion or prediction as to any future event, was made recklessly by Erickson.

There is no finding and no evidence that Erickson was doing any more than merely expressing an opinion as to the happening of a future event. As to Erickson, the jury was quizzed only about his opinions or pre-

dictions about future events—these events being a good while off in the coming months and years *and being dependent on the actions of the Smiths.* These two facts make this case meaningfully different from those cited by Appellees. There is no evidence that Erickson had, or purported to have had, any special knowledge of future facts or future events that will actually occur and exist in the future. *Trenholm v. Ratcliff,* 646 S.W.2d 927 (Tex.1983). Furthermore, there is no evidence to demonstrate the elements of actionable or remedial fraud in Texas under *Wilson, supra* or *Trenholm, supra.* Furthermore, there exists no evidence in the record to support the jury's finding to Special Issue 10a and no evidence in the record to support the finding that fraud was a proximate cause of the damages, if any, to the Plaintiffs in Special Issue 11, the proximate cause issue. The element of foreseeability is absent.

A promise to do or perform an act in the future may constitute actionable fraud when, but only when, made with the intention, design and purpose of deceiving and with no intention of performing the act. *Spoljaric v. Percival Tours, Inc.,* 708 S.W.2d 432 (Tex.1986).

Again, no evidence exists that the promises to perform future acts were made *with the intention, design and purpose of deceiving and with no intention of performing the same;* and the same state of the record exists as to the *future predictions concerning the value of the house when completed, the amount of the monthly note, and the alleged future representations concerning* either permanent financing or interim financing. These financing institutions were third entities. The Smiths could not have reasonably relied upon these predictions. Erickson did not control these third entities. The Smiths alleged reliance on such third entities for financing renders this case dramatically different. They are not parties to this suit. The judgment should not stand concerning the jury's findings based on the theory of actionable or remedial fraud as the same has been well recognized and honored in Texas. The rule defeats the Smiths. *See*

*Stanfield v. O'Boyle,* 462 S.W.2d 270 (Tex. 1971).

Our Supreme Court has held that actionable fraud can, or may be, founded upon a promise of future action with a present intention not to perform. *The intention not to perform is the intent of the speaker or promisor. In the case at bar the future events depended on the Smiths or third entities. Stanfield v. O'Boyle, supra; Chicago, T. & M.C. Ry. Co. v. Titterington,* 84 Tex. 218, 19 S.W. 472 (1892). There is no evidence of probative force or evaluation to sustain the judgment or the attempted findings of the jury based on fraud. This Texas rule on fraud is adverse to Appellees. Our Supreme Court, in *Custom Leasing, Inc. v. Texas Bank and Trust Company of Dallas,* 516 S.W.2d 138 (Tex.1974), reaffirmed the holding in *Wilson v. Jones, supra,* that each of the elements set out in *Wilson* must be established with a reasonable degree of certainty and that an absence of any one of the six elements will prevent a recovery.

Neither Erickson nor Miles Homes could have intended for some third person or third entity lending institution to not perform a prediction of a future act or that some third party lending institution would not offer either interim or permanent financing. Nor could the Smiths have relied on these "future promises". Neither Erickson nor Miles Homes could have intended for the Smiths not to perform their promised future acts. Not only did these promises or predictions deal with events to take place in the future, they involved third entities over which Erickson had no control. *See Reed v. First National Bank of Dallas,* 645 S.W.2d 843 (Tex.App.—Dallas 1982, no writ). It simply defies logic to state that either Miles Homes or Erickson made a promise or a prediction concerning a future act or event and, at the same time, Miles Homes and Erickson had no intention for the third entity lending institution to either grant, or fail to grant, interim or permanent financing. *Turner v. Biscoe,* 141 Tex. 197, 171 S.W.2d 118 (Tex.Comm'n App.1943, opinion adopted). Since the majority overlooks the cases on predictions of future events, I dissent.

### The Measure of Damages Issue

In *Leyendecker & Associates, Inc. v. Wechter*, 683 S.W.2d 369 (Tex.1984), the Supreme Court wrote that our jurisprudence had recognized two measures of damages for misrepresentation. The common law in our State allows an injured party to recover the actual injury or damage suffered measured, however, by "the difference between the value of that which he has parted with, and the value of that which he has received", citing *George v. Hesse*, 100 Tex. 44, 93 S.W. 107 (1906). No evidence exists of the value of that which the Smiths parted with. This measure of damages is known as the "out of pocket" measure and is *calculated as of the time of the sale*. No evidence is before us on this measure of damages. A careful, exhaustive search of the record shows nothing on "out of pocket" measure of damages. The Supreme Court cited W. Prosser, *Handbook of the Law of Torts* sec. 110 (4th ed. 1971). This measure of damages recognized by our common law was never submitted to the jury. In the court's charge, in Special Issue No. 7, actual damages were defined as meaning "pecuniary loss including reasonably foreseeable incidental and consequential damages", this being the breach of contract damage definition.

There is a second measure of damages recognizable under Texas law. This measure was known as "benefit of the bargain" measure. This "benefit of the bargain" measure allows the plaintiff to recover the difference between *the value as represented* and *the actual value received*, our Supreme Court citing with approval, *Johnson v. Willis*, 596 S.W.2d 256, 262 (Tex.Civ.App.—Waco, 1980) *writ ref'd n.r.e. per curiam*, 603 S.W.2d 828 (Tex. 1980). This "benefit of the bargain" measure was never submitted to the jury. Also, Appellees' theory and contentions as to the value as represented (being the $75,-000 to $80,000 value) were defeated because of the jury's verdict. The two actual damage issues employed the same definition.

The Supreme Court has held that the DTPA permits a plaintiff to recover under either the "out of pocket" rule or the "benefit of the bargain" rule, but neither one of these was submitted to the jury. It is correct that there was a third submission of damages based on negligence, under Special Issue No. 22, which asked what sum of money would fairly and reasonably compensate the plaintiffs for the *actual damages* they sustained, if any, as a result of the negligent acts or omissions of Miles Homes. The district court's judgment was *not founded on negligence*. Again, actual damages were only defined once in the court's charge. The definition of "actual damages" as it appears in the charge is substantially the definition of the measure of damages for a breach of contract; and, yet, under the breach of contract theory, punitive damages cannot be recovered unless there is a separate, distinct and independent tort committed. There is no such tort in the record sub judice. There is no evidence of the measure of damages known as the "out of pocket" measure at the time of the sale because there is no evidence of the value of that which he (Smith) parted with at the time of the sale or the value of that which he received. There is no jury finding as to the second remedy known as the "benefit of the bargain" measure. Apparently, the majority tries to ascertain this measure but fails to follow *Pool v. Ford Motor Co.*, 715 S.W.2d 629 (Tex.1986). This Court of Appeals cannot find facts.

Appellees contend Erickson represented to them that the house, when completed, would have a value of from about $75,-000.00 to $80,000.00. Again, the jury found adverse to the Smiths on this very issue. In fact, the able counsel for the Appellees argued and took the position that *this contention was the real crux of the whole case*. From the argument and summation we find:

"The next one talks about—Special Issue Number Four. Three ought to be, 'We do.' The next is Number Four, the real crux of the whole case. Did he represent the house to be worth seventy-five to eighty thousand dollars? He sure did. Did he represent the house would

only be four to four-fifty a month? He sure did. Did he represent that the house, as represented, you know, one acre on the letter, one acre of land, you can get a permanent loan? He sure did. Were they? No, they've got to put up their mobile home and two other acres and then it ain't worth but fifty-two thousand dollars."

Appellees did not attempt; and hence failed, to get jury findings as to the difference between the value of the house when completed *as allegedly represented by Erickson* and the actual value as a completed house. The house has not, of course, reached completion. Appellees failed to obtain jury findings on this measure of damages even under their appraiser's testimony.

It is glaringly clear that an intermediate court of appeals can "unfind facts" but cannot "find facts". *Texas Nat. Bank v. Karnes, supra.* Nevertheless, the Court in the majority opinion states: "Smith owes $36,883 on the property. The value of the encumbered land is $3,500. Smith expended $1,500 installing the slab. The fair market value of the property is $19,600, leaving actual damages in the amount of $22,-283." The 9th Court is affirmatively finding facts. The jury certainly did not find that amount. The values found by the 9th Court on the encumbered land and the fair market value of the property were based on mere opinions of an appraiser. These opinions, as to values, merely raise issues. They do not determine issues as a matter of law; mere opinions as to values do not conclusively determine or establish "facts". The Court, therefore, has eviscerated the holding of *Texas Nat. Bank v. Karnes, supra.* Hence, in reality the 9th Court has acted as a super jury which, with due respect, it cannot do. A court of appeals cannot make *original findings of fact,* it can only "unfind" facts. *Texas Nat. Bank v. Karnes, supra; City of Beaumont v. Graham,* 441 S.W.2d 829, 831–33 (Tex. 1969). In my opinion, with respect, my brothers have found the value of the land and found the fair market value of the property and found actual damages in the amount of $22,283, in violation of the two

cases cited immediately above; my judicial brothers have failed to follow *Pool v. Ford Motor Co., supra.*

Concerning the correct measure of damages, it is crucial to recall that the parties entered into a written contract and the Appellant was obligated to deliver to the Appellees certain materials to be used to build a house. The cost of that package of materials was clearly established to be $28,501.00. This figure was agreed upon. Appellees were also obligated to construct the house and acquire certain other materials. As shown, the Appellees made no real complaint concerning the materials. No jury issue was submitted concerning either the cost or the value of the package or the actual fitness of the materials. The Appellees received two shipments, accepted the same and actually incorporated and used the first package of materials to start the building of a house which was not completed. Neither did Mr. Smith complain about the second shipment.

As I read the briefs, neither protagonist to this appeal is asking for the $22,283.00. Able and resourceful counsel for the Appellees, in his final summation to the fact finders, orated:

"Let me show you something. (Going to board.) Now, I'm going to show you what the actual damages are in this case. Now, they won't even tell you if they're going to foreclose or not. They ain't got enough guts to tell you that, even. Now, watch this. They're going to foreclose as soon as we walk out of the Courthouse. Face amount of the lien, fifty-two thousand, five hundred and one dollars. (Writing on board.) Present value, nineteen thousand, four hundred dollars. Leaves a deficiency of thirty-three thousand, one hundred dollars. Now, remember the testimony about Mr. Smith, about all of his labor and he was making almost thirteen dollars an hour and about a thousand hours? I'm not making that up. That's the way it happened from this witness stand. That's about twelve thousand dollar [sic] in labor. I'm going to just reduce it to ten just to be fair. Forty-three thousand, one hundred dol-

lars. This figure does not include the land. If they foreclose, he loses his land. That's forty-six, five. You add to it the fifty-four hundred dollars in interest and if they foreclose, fifty-one thousand, nine hundred dollars."

It is undisputed that there has been no foreclosure. There is no showing that there was or is any intention or plans to foreclose.

### The Punitive Damage Question—Interim Financing

This record does not reflect a justification of punitive damages. Mr. Smith stated he never got around to filling out an application for interim financing. He conceded that he could have obtained a loan on a house that was incomplete, but he stated that the monthly notes would have been around $700.00. Mr. Smith did not even contend the $400.00 to $450.00 cap on monthly note installments applied to interim financing. Mr. Smith said he had no real complaint about the quality of the building materials sent by Miles Home. He was basically complaining *about the financing situation.* He admitted he had agreed to the contract and that he wanted to buy personally a list of materials from local sources other than Miles because he could get them cheaper and that was the way he wanted to proceed with the contract agreement. Mr. Smith acknowledged that the second load of materials from Miles was satisfactory and that he had almost completely installed the first load and had sent favorable photographs of his work to Miles Homes.

The record shows that, although Mr. Smith experienced some reduction in his hourly pay, his yearly income was about the same because of overtime that he worked.

The contract transaction was carried out according to Mr. Smith's wishes. The record shows his choice:

"Q And you checked, 'Will you receive cash assistance from anyone?' 'No.'...."

Mr. Smith later stated that he had filled that part of the contract according to his best recollection.

It is fair to summarize that Mr. Smith's real complaint is that *Erickson told him that the completed house would appraise for about $75,000.00 to $80,000.00 and that the note would be only $400.00 to $450.00 per month.* These were the bases of Mr. Smith's lawsuit. The jury found adversely to Appellees on the alleged representation that Erickson had said the completed house would be worth $75,000.00 to $80,000.00. The size of the monthly note payment is addressed in another part of this dissent.

### The Judgment Provisions

The judgment provides, inter alia, as follows:

"The Court finds that actual damages awarded in Special Issues Nos. 7, 12 and 22 are identical damages under different theories of recovery; thus the Plaintiffs should recover only once for actual damages. The Court further finds that additional damages awarded in Special Issue No. 9 and exemplary damages in Special Issue No. 14 are both exemplary damages under different theories of recovery, thus the Plaintiffs should recover only once for exemplary damages, that being $250,000.

"The Court further finds that the Plaintiffs are entitled to recover alternatively under each theory found in answer to the Special Issues, and in the amounts found therein; however, the Court further finds that the findings of damages under the Special Issues would result in the Plaintiff's recovering identical damages under different theories of recovery; therefore, *the Court finds that the Plaintiffs are entitled to recover only under the theory of fraud inasmuch as the damages recoverable thereunder are the largest amount* under the findings of the Special Issues of the jury." (Emphasis added)

I maintain the court allowed recovery under mixed theories resulting in overlapping recoveries.

Then the trial court found that the actual damages submitted under several special issues were in the amount of $50,733.00. The court further found the exemplary damages, under Special Issues 13 and 14, to be in the amount of $250,000.00. The Court additionally found that the legal services, as inquired about in Special Issue No. 15 was in the amount of $50,000.00, plus $15,000.00 attorney's fees in the event of an appeal to the Court of Appeals, plus an additional second $15,000.00 attorney's fees in the event of an appeal to the Texas Supreme Court.

Hence, the court decreed that the total judgment was in the amount of $350,-733.00, representing actual damages, exemplary damages and attorney's fees. It appears that the trial court permitted the exemplary damages to be recovered under the theory of fraud and, in addition thereto, the attorney's fees damages to be recovered under the theory of D.T.P.A. Attorney's fees usually are to be considered as one of the elements of exemplary damages. See STATE BAR OF TEXAS, TEXAS PATTERN JURY CHARGES PJC 8.06 (1987). The trial judge instructed the jury that, in assessing exemplary damages, the jury may consider all of the facts as shown by the evidence, which certainly included facts involving the issues of attorney's fees. Hence, by deduction and by logical conclusion, the jury had to have considered the attorney's fees element under the court's charge when it awarded the $250,000.00 as exemplary damages or punitive "smart money". Logically, there would be double recovery of the attorney's fees or, certainly, an overlapping of the attorney's fees and the exemplary damages awarded. I cannot agree to overlapping partial double damages.

## BACKGROUND FACTS

The record shows that Mr. Smith has been working maintenance for a long time and that maintenance is a more stable type of employment, Mr. Smith having been employed at the same location for some period of time. Mr. Smith had worked at Mobil Chemical steadily since August of 1978. He also testified that his income had been substantially the same since 1982. That although two pay cuts had come about, that he had worked overtime so that his total income was substantially the same from 1982 through the date of the trial. When the Smiths became interested in the Miles Homes, he was making about $32,-000.00 a year, but had no down-payment money readily available. He testified that John Erickson contacted him on September 10, 1982, about building a home.

The witnesses that were proffered by the Appellees affirmatively and unequivocally testified in a clear and unambiguous manner that the house had to be complete before anyone could get permanent financing. Appellees are bound by this testimony since they, by placing these witnesses on the stand, vouch for their credibility and believability.

The record affirmatively reflects that Casimir [also Casmire] Burzynski was called as a witness by the Plaintiff. Burzynski could not be called as an adverse party, since he was not, and he was not called as an adverse or hostile witness. Miles Homes of Insilco was the sole defendant. Appellees are bound by Burzynski's testimony especially on the independent contractor issue. Appellees proved Erickson was an independent contractor.

The Plaintiffs proffered Plaintiffs' Exhibits Nos. 3 and 4. Plaintiffs' Exhibit No. 3 was the retail installment contract, signed by Erickson, the sales representative and by Leonard and Christine Smith. Also, Plaintiffs' Exhibit No. 4 was admitted. Therein, the Plaintiffs proved that they, themselves, were going to provide their own brick and slab and that the contract did not cover plumbing or electrical equipment or other kinds "of stuff". The Plaintiffs showed that those were optional items that the homeowners in this case, the Smiths, could and desired to purchase for themselves and thereby not purchase the same from the Miles Homes. The proof showed that, as to the details of the transaction, those were matters that rested with Erickson, rather than Miles Homes. Erickson had control of the details of the con-

tract and the right to control. For example, the choice of delivery of certain promotionals or delivery promotionals (as they are referred to) was the Smiths. The Smiths proved that there was not any limitation, from their testimony and their version of the case, as to Mr. Erickson's independent authority as an independent contracting party. Since there was no limitation, it should be deduced that Erickson was acting as an independent contractor rather than an agent or an employee. In fact, it was the Plaintiffs who offered proof that, under his contract, Erickson had contracted to be an independent contractor with the principal, Miles Homes.

Plaintiffs' Exhibit No. 4 shows the variations and options. Those variations and options were authorized, agreed to and understood by the Smiths, with Erickson's consent.

The Smiths proved up that Erickson paid his own expenses, paid his own insurance and medical bills, withheld his own withholding tax on his income and his social security taxes and that none of these taxes were withheld, dealt with, or deducted by Miles Homes from Erickson's commissions. The facts cogently show that he was an independent contractor. This evidence was offered and produced by the Smiths. At the time of trial, Erickson was not an employee of Miles Homes, which is significant. Miles Homes had no control of Erickson at trial date.

Indeed, the Smiths showed that there were no fixtures in the house, nor electrical wiring, nor brick, nor heating, nor air-conditioning. But it was also shown that that was what the Smiths wanted in the beginning. The Smiths clearly failed to perform their promises—indeed, their own decisions and demands. It was clearly shown that both Mr. and Mrs. Smith were gainfully employed and that they had not become unemployed. The Smiths elicited and proffered testimony to the effect that Erickson had received instructions to enable him to act as an independent contractor in the sale of the products of Miles Homes.

### Appraiser Laurie Leister's Testimony

Laurie Leister, found the size of the foundation to be 1,950 square feet. That included the garage. She placed $2.53 per square foot on that which amounted to $4,933.50, and, rounded off, about $5,000.00 value for the slab, itself. The structure, over and above the slab, equaled about $3,510.00. That structure was figured at about $1.80 per square foot. For the exterior wall framing, there was 190 lineal feet at $64.56 a lineal foot, which equals $12,266.40, plus insulation and sheathing, which was another 190 lineal feet at $6.40 per foot, equaling $1,216.00. The ceiling was estimated at $17.16; the wood structure and cover at 1,950 square feet at $4.04, equaling $7,878.00. Laurie Leister's estimated cost new and the property in the "as is" condition would be $19,600.00. Her estimate was that the completed, fair market value of the finished house would be $51,500.00, including the land. She valued the land at $3,500.00. She opined the real cost of completion would be $28,400.00. The appraiser did concede, on cross-examination, that there was nothing wrong with the unfinished house and that the partial construction was excellent at the time of trial. The materials were good.

### Mr. Smith's Admissions

Mr. Smith admitted, readily, to signing Plaintiff's Exhibit No. 8, which is a Builder's and Mechanic's Lien Contract. It is described in other parts of the record as a Builder's and Mechanic's Lien. It, obviously, was a lien upon land and real estate. This lien agreement was spoken of, and described, by Mr. Leonard Smith as being a contract. On October 18, 1982, the Builder's and Mechanic's Lien Contract was executed, or shortly thereafter, so the Builder's and Mechanic's Lien was in effect at the time of the first delivery of any materials, which took place on December 20, 1982. There can be no question that this litigation is dealing with a contract and with a lien that definitely involved land and land titles.

Mr. Smith had partially paid out of his pocket for the slab. The cost, he testified, was approximately $5,500.00 and he testi-

fied *that he did get assistance from Miles for about $4,000.00* with the remainder being $1,500.00.

In *Leyendecker & Associates, Inc. v. Wechter,* 683 S.W.2d 369 (Tex.1984), (On Motion for Rehearing), the Supreme Court, without dissent, wrote, at page 373:

"... Texas courts have recognized two measures of damages for misrepresentation. Texas common law allows an injured party to recover the actual injury suffered measured by 'the difference between the value of that which he has parted with, and the value of that which he has received.' *George v. Hesse,* 100 Tex. 44, 93 S.W. 107 (1906). This measure of damages is known as the 'out of pocket' measure and is calculated as of the time of sale. W. Prosser, *Handbook of the Law of Torts* Sec. 110 (4th ed. 1971). The second remedy available in Texas, known as the 'benefit of the bargain' measure, allows the plaintiff to recover the difference between the value as represented and the actual value received. *Johnson v. Willis,* 596 S.W.2d 256, 262 (Tex.Civ.App.—Waco), *writ ref'd n.r.e. per curiam,* 603 S.W.2d 828 (Tex.1980)...."

. . . .

"The Wechters could have sought recovery on either of the alternative theories described above. The negative jury finding precluded recovery on the 'benefit of the bargain' theory, leaving open the 'out of pocket' measure. As stated above, this measure requires a comparison of the value received against the value parted with. The jury found the value of the 2,411 square feet to have been $4,822 when purchased, but no issue was submitted inquiring as to the value the Wechters paid for the 2411 square feet as distinct from the purchase price of the entire lot and improvements. Furthermore, the record contains no evidence of this value. The Wechters are therefore not entitled to recovery under either theory."

The Smiths failed to prove either the "benefit of the bargain" theory or the "out of pocket" measure. Hence, like the Wecht-ers, the Smiths are not entitled to a recovery.

### Smiths' Counsel's Argument and Position on Actual Damages And the Foreclosure Question

The position taken on this issue (actual damages) by Appellees is fallacious in my opinion. The first premise is in error in stating the amount actually owing on the lien. No evidence exists that the Appellees would owe the $52,501.00 if at some future uncertain date a foreclosure occurred. There is no evidence that there will be a foreclosure in the future. There was certainly no foreclosure as of the date of trial; nor was one planned. Next, the Appellees deducted $19,400.00 to reach a figure of $33,100.00. The Appellees own appraiser swore that the house when completed—fully completed—would be worth $51,500.00 which included a land value of $3,500.00, and that the uncompleted, as is, where is, house was valued at $19,600.00 which did not include the land. Using the face amount of the lien and the value of the house, as is and incomplete, simply had no relevancy, materiality or probative force to determine the correct amount of damages, if any, that the Appellees sustained under their theory of the case; namely, the difference of the value as represented and the estimated value as a completed house.

Appellees' counsel then argued that the labor performed was in the amount of $12,000.00 but reduced the same to $10,000.00 in an effort, he said, to be fair. But on cross-examination the Appellee admitted that he had only about $6,000.00 in labor in the house. And he actually replied that that was what he had been told. Upon direct questioning, Appellee Leonard Smith was asked about the value of the labor: "Do you know?" The answer was: "No, sir." Nevertheless, in summing up, Appellees' attorney added $10,000.00 for labor and an additional $3,500.00 for the land plus $5,400.00 for interest. Counsel made an alternative argument whereby he argued that Erickson had represented the value of the house when completed would be $75,000.00. Counsel then argued that the house was worth, in its incomplete

state, $19,400.00, leaving an argued-for actual loss of $55,600.00. He stated that was the actual damage.

As to the $75,000.00 argument, in view of the jury's adverse finding, it is clear that the judgment could not be based on the other argument counsel used; that is, the "as is" value of $19,400.00 instead of the completed value of $51,500.00. Appellees at trial simply failed to advance an approved measure of damages.

### The Governing, Paramount Statute: Tex.Bus. & Com.Code Ann. sec. 27.01 (Vernon 1968)

The written contract between Miles Homes and the Smiths was dated in September of 1982. At that time TEX.BUS. & COM.CODE ANN. Sec. 27.01, entitled "Fraud in Real Estate and Stock Transactions", stated that, for fraud in a real estate transaction, a defendant would be liable to the person defrauded for *exemplary damages not to exceed twice the amount of the actual damages.* Sections 1, 3 and 4, Acts 1967 of the 60th Legislature, Volume 21, page 2343, Chapter 785. It is abundantly clear that, at the time the parties entered into their written contract, the law that governed fraud in a transaction involving real estate limited the recovery of exemplary damages to twice the amount of actual damages. TEX.BUS. & COM.CODE ANN. sec. 27.01 (Vernon 1968). The Texas Business and Commerce Code was effective as of September 1, 1967, being House Bill No. 293. See 1967 TEX.GEN.LAWS, Chapter 785, section 1, page 2343. There can be no doubt that this was a contract involving real estate because it was the undoubted and proven intention of the parties at the time of the signing of the contract that the materials would be incorporated into a house. In fact, the first shipment of materials (or virtually all thereof), was actually constructed into the beginnings of a house and was permanently affixed to the soil and became real property. Furthermore, the Builder's and Mechanic's Lien contract directly involved real estate by affixing a lien on the land in question. The plaintiffs affirmatively plead this Builder's and Mechanic's Lien contract. It

is correct that TEX.BUS. & COM.CODE ANN. sec. 27.01 has been amended so that the person defrauded may recover more exemplary damages. But this amendment was not effective until September 1, 1983. See section 27.01(c). The amendment was by Acts of 1983, 68th Leg. page 5208, Chapter 949, sections 1 and 2. The Builder's and Mechanic's Lien contract was dated in December of 1982. This amended act passed by the 68th Legislature in regular session, set out as chapter 949, beginning at page 5208, also provides:

"SECTION 3. This Act applies to fraud if every element of the fraud occurred on or after the effective date of this Act. If an element of fraud occurred before the effective date of this Act, the fraud is governed by Section 27.01, Business & Commerce Code, as it existed before being amended by this Act, and that law is continued in effect for that purpose.

"SECTION 4. The provisions of Section 27.01, Business & Commerce Code, as amended, and this Act do not abrogate or repeal any other laws relating to the rights, duties, obligations, or liabilities of principals and agents to one another or to third parties.

"SECTION 5. This Act takes effect September 1, 1983."

Thus it is glaringly clear that putting the best face upon the issue (under the majority of the 9th Court opinion finding that the actual damages are in the amount of $22,283.00) that the most that can be awarded by way of exemplary damages is $44,566.00 in view of the definitive language of 27.01, both before and after the 1983 amendment.

### Smiths' Chosen Contract Unique

The instant case is distinguishable and different from those cited and relied upon by the Appellees because under this record, the Smiths, themselves, by their own choice, were going to provide partially for their own slab and Mr. Smith was to buy the plumbing and electrical equipment and other types of materials. It is undeniable in this record that the Smiths did not per-

form their agreements. The Smiths were to perform the labor to complete the house; they failed to perform.

### The Verdict

The verdict in this case is manifestly unjust and contrary to the record and the statute. TEX.BUS. & COM.CODE ANN. sec. 27.01. The Courts of Appeal have a duty under the Texas Constitution to pass upon insufficient evidence points as well as points involving the overwhelming preponderance of the evidence. *See Cropper v. Caterpillar Tractor Co.,* 754 S.W.2d 646 (Tex.1988); TEX. CONST. art. I, sec. 15. Appellees in their brief place major reliance on a case that they maintain is very much like the one on appeal. They rely upon *Spies–Roberts, Inc. v. Opperman,* 741 S.W.2d 149 (Tex.App.—Fort Worth 1987, no writ). In fact, Appellees chide the Appellant in this manner, we quote from Appellees' brief:

"APPELLEES feel compelled to bring to the court's attention the fact that even though *Spies–Roberts* is closely analogous to the instant case, APPELLANT has chosen to totally ignore its application to the resolution of these issues."

It is very interesting and significant and surprising to note that, at 741 S.W.2d at page 150, there is an editor's note on an otherwise blank page. The editor's note reads:

"Editors Note: The opinion of the Court of Appeals of Texas, Fort Worth, in *Spies–Roberts, Inc. v. Opperman,* published in the advance sheet at this citation, 741 S.W.2d 149–169, was withdrawn from the bound volume because the court ordered that it not be published."

The rule is that an unpublished opinion is not a decisional precedent or authority.

In the Appellees' brief it is clearly demonstrated that they are relying upon the apparent authority of an agent. In Erickson's contract with Miles Homes there is no reference to an agency relationship and the record is devoid of any evidence that the written contract was a subterfuge. The Appellees' position is clear. The Appellees' brief states as follows:

"... Thus, an apparent agent is one who the principal induces third persons to believe is his agent, even though no actual authority, either express or implied, has been granted to such agent and the acts of such agent within the scope of his apparent authority are as binding on the principal as if the agent were actually possessed of such authority."

But there is simply no jury finding whatsoever on the question of agency by the doctrine of apparent authority. The judgment is based on a jury finding of agency which is not supported by the record. Appellees' position and discourse under the doctrine of apparent agency either admits or concedes that *there was no actual authority in Erickson.* They further argue that even assuming that Erickson did not have any apparent authority; nevertheless, the judgment should stand on what they claim were the representations of the corporate defendant directly acting somehow by itself.

Again, in arguing for the punitive damages they recovered, the Appellees rely upon *Spies–Roberts, Inc., supra,* maintaining that the award of punitive or exemplary damages in the ratio of approximately 6 to 1 to the actual damages was found not to be excessive. *Id.*

On the punitive damages and especially on the amount awarded, being a quarter of a million dollars, $250,000.00, Appellees rely upon *Voskamp v. Arnoldy,* 749 S.W.2d 113 (Tex.App.—Houston [1st Dist.] 1987, writ den'd). They stress that Justice Levy approved an award of punitive damages found to be in the ratio of 6 to 1 and 4 to 1 as to the actual damages. The actual damages in our case found by the majority is $22,283 and the punitive damages of $250,000.00 being a ratio of more than 11 to 1. But Justice Levy writes, at page 121:

"... Having viewed these awards in light of the nature of the wrong, the character of the conduct involved, the degree of culpability of the wrong-doer, the situation and sensibilities of the par-

ties concerned, and the extent to which such conduct offends a sense of justice and propriety, we conclude that the jury's award of punitive damages is reasonable in light of the Arnoldys' deliberate concealment of material information intended to cause the Appellants to relinquish the fair market value of their stock."

I respectfully submit that the *Voskamp* case is simply totally different and distinguishable from the case on appeal. *See Alamo National Bank v. Kraus*, 616 S.W.2d 908 (Tex.1981). I maintain again that punitive damages are not proper in this case but in any event the ratio here to actual damages is way out of line, if not outrageous. This is especially true after carefully reading the entire Statement of Facts and record in the case and in particular the testimony of the Smiths.

Therefore, in my view, the Appellant's Points of Error Nos. 1, 4, 5, 8, 9, 10, 13, 14, 15, 16, 17 and 20, should be sustained. Hence, the judgment below should be reversed with a resulting rendition that the Appellees take nothing of and from Miles Homes. In the alternative, but only in the alternative, certainly Points of Error Nos. 2, 3, 6, 7, 11, 12, 18 and 19 (being "insufficient evidence" points or "great weight and preponderance" points) would and should logically be sustained, resulting in a reversal of the judgment and a remand of the cause for a new trial.